No. 14-56596

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MAVRIX PHOTOGRAPHS LLC,

*Plaintiff-Appellant,*

*v.*

LIVEJOURNAL, INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the Central District of California,*
*Case No. SACV 13-00517-CJC(JPRx)*
*The Honorable Cormac J. Carney, United States District Judge*

**BRIEF OF *AMICUS CURIAE* MOTION PICTURE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF NEITHER PARTY**

Kelly M. Klaus
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 644-6959

Counsel for *Amicus Curiae* Motion Picture Association of America, Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, the Motion Picture Association of America, Inc. certifies that it has no parent or subsidiary corporations and that no publicly held company owns 10% or more of its stock.

# RULE 29 STATEMENTS

This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties.

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amicus* Motion Picture Association of America, Inc. states that: (1) no party's counsel has authored this *amicus* brief in whole or in part; (2) no party or party's counsel has contributed money intended to fund the preparation or submission of the brief; and (3) no person other than *amicus*, its members, and their counsel has contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

RULE 29 STATEMENTS ................................................................ ii

I. INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ......................1

II. OVERVIEW OF MAVRIX'S ALLEGATIONS ...........................................4

III. ARGUMENT.............................................................................................6

    A. CONGRESS ENACTED THE SAFE HARBORS TO LIMIT THE LIABILITY OF SERVICE PROVIDERS THAT ARE INNOCENT WITH RESPECT TO INFRINGING CONTENT ..........6

    B. EXTENDING THE SAFE HARBOR TO A SERVICE PROVIDER THAT ACTIVELY CURATES ITS SITE TO FEATURE LIKELY INFRINGING CONTENT INTENDED TO DRAW USERS TO THE SITE UNDERMINES THE PURPOSE OF THE SAFE HARBORS................................................8

        1. "Storage at the Direction of a User" .........................................8

        2. Red Flag Knowledge..................................................................11

        3. "Right and Ability to Control" Infringing Activity .................13

CONCLUSION ........................................................................................16

CERTIFICATE OF COMPLIANCE....................................................17

CERTIFICATE OF SERVICE .............................................................18

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
   239 F.3d 619 (4th Cir. 2001) .............................................................................7

*BWP Media USA Inc. v. Clarity Digital Grp., LLC*, No. 14-CV-00467-PAB-
   KMT, 2015 WL 1538366 (D. Colo. Mar. 31, 2015) ...........................................9

*Capitol Records, LLC v. Vimeo, LLC*,
   972 F. Supp. 2d 537 (S.D.N.Y. 2013) ..........................................................10, 12

*Columbia Pictures Industries, Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ......................................................................12, 13

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ..........................................................................6, 7

*Mavrix Photographs LLC v. LiveJournal, Inc.*, No. SACV 13-00517-
   CJC(JPRx), 2014 WL 6450094 (C.D. Cal. Sept. 19, 2014) ...........................5, 6

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) .......................................................14, 15

*Tur v. YouTube, Inc.*, No. CV064436 FMC AJWX,
   2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) ........................................15

*UMG Recordings v. Shelter Capital Partners LLC*,
   718 F.3d 1006 (9th Cir. 2013) ...................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ..........................................................................9, 10

**FEDERAL STATUTES**

17 U.S.C. § 512(c) .............................................................................*passim*

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105–796 (1998) .................................................................7

S. Rep. 105-190 (1998) ..............................................................................6

iv

## I.  INTRODUCTION AND INTEREST OF *AMICUS CURIAE*

Founded in 1922, the Motion Picture Association of America, Inc. ("MPAA") is the not-for-profit trade association that addresses issues of concern to the United States motion picture industry.  As the world's leading producers and distributors of motion pictures and television shows in all formats and all channels of distribution, including online distribution, the MPAA's members depend upon effective copyright protection to protect the motion picture and television content that they finance, create and distribute.[1]  It is critically important to the MPAA that the DMCA's safe harbor provisions limiting monetary liability for claims of copyright infringement extend only to those service providers that satisfy all of the conditions that Congress placed on such safe harbor protection.

The MPAA takes no position regarding what the facts of this case are.  The MPAA submits this brief solely to help the Court understand why this case provides no basis for upsetting settled law about the conditions that a service provider must satisfy to invoke the § 512(c) safe harbor.

The defendant in this case, LiveJournal, operates a website—"Oh No They Didn't!" ("ONTD!")—showcasing celebrity photographs and other content

---

[1] The MPAA's members are:  Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, Walt Disney Studios Motion Pictures and Warner Bros. Entertainment Inc.

submitted by the site's users. The plaintiff, Mavrix, contends that a number of these posts contained content that infringed its copyrights.

Arguing that its posts are all submitted by users, LiveJournal argues that the § 512(c) safe harbor immunizes it from any liability for infringement. Mavrix, on the other hand, contends that LiveJournal actively controls the publication process in order to add likely infringing content taken in whole from third-party sources. For that reason, Mavrix contends that LiveJournal is not entitled to the DMCA safe harbor.

According to Mavrix, LiveJournal did not simply monitor the ONTD! site for objectionable or infringing content, but rather manually curated potential submissions in order to feature high-quality, high-value copyrighted content owned by third parties—all with the purpose of creating a "draw" to the site based on premium content. Mavrix alleges that LiveJournal adopted rules specifically requiring users to submit only materials copied in their entirety from third-party sources; that such material carried indicia strongly indicating that it was copyrighted and owned by a third party; and that Live Journal ignored these indicia of third-party copyright ownership in order to increase the quality of content on the site and to draw more users to that content. LiveJournal disputes that the evidence supports any of these allegations.

The MPAA takes no position on the facts of this case.  If the record supports Mavrix's allegations that LiveJournal solicited and actively curated posts for the purpose of adding, rather than removing, content that was owned by third parties in order to draw traffic to its site, LiveJournal would not be entitled to summary judgment on the basis of the safe harbor for the reasons we explain below.  If, however, the record does not support Mavrix's allegations, this Court can and should resolve this case without upsetting any of the following well-settled principles:

First, a service provider that adopts rules requiring users to submit infringing material and then, with the purpose of limiting its site to hosting high-value, likely infringing content, manually prescreens each post before deciding whether to add it, is not "stor[ing]" material "*at the direction of a user*."  17 U.S.C. § 512(c)(1) (emphasis added).  It is the service provider who is directing the hosting and dissemination of infringing material.  The DMCA provides no safe harbor from liability for that conduct.

Second, a service provider that actively invites and posts popular copyrighted content on its website—by actively prescreening posts according to its own criteria requiring users to copy material wholesale from third-party sources— has "red flag knowledge" of "facts or circumstances from which infringing activity

3

is apparent."  17 U.S.C. § 512(c)(1)(A)(ii).  Such a service provider cannot claim the safe harbor, either.

Third, a service provider has the "right and ability to control" infringing material from which it derives a "financial benefit directly attributable to the infringing activity," 17 U.S.C. § 512(c)(1)(B), when it acts as a gatekeeper, assessing each individual post to confirm that it has been copied in its entirety from a third-party source in order to populate the provider's site with premium content that will attract visitors.  That type of service provider also cannot claim the benefit of the § 512(c) safe harbor.

Again, we emphasize that if the evidence does not support Mavrix's allegations, the Court can resolve this case without undermining the foregoing principles.  But if the evidence supports Mavrix's allegations, then any one or all of these well-settled principles would preclude summary judgment for LiveJournal under the § 512(c) safe harbor.

## II.    OVERVIEW OF MAVRIX'S ALLEGATIONS

Although this brief does not address the sufficiency of Mavrix's evidence, an understanding of Mavrix's allegations helps to place the legal issues in context. We understand Mavrix to have alleged that LiveJournal not only monitored possible postings to ONTD!, but actively curated those postings based on rules it established that ensured that the content that made it past LiveJournal's screen

would likely be infringing, and intentionally ignored the infringing nature of the content it had both solicited and selected for posting to the site.

The district court described the mechanics of submitting material to ONTD! as follows: "When a user submits a post, it is automatically uploaded onto LiveJournal's servers and placed in a queue. Any moderator signed in at the time can reject the post or approve it, at which point it becomes visible to the community." *Mavrix Photographs LLC v. LiveJournal, Inc.*, No. SACV 13-00517-CJC (JPRx), 2014 WL 6450094, at *1-*2 (C.D. Cal. Sept. 19, 2014). Mavrix alleged that a LiveJournal employee, Delzer, effectively controlled whether any user content could be added to the site because he "exert[ed] control over the other ... moderators, who then presumably control the activities of users." *Id.* at *7. The district court, however, found that the evidence did not show that Delzer exercised the kind of control that Mavrix contended that he or other alleged agents did. *Id.* at *7-*8 & n.6.

Mavrix alleged that Delzer and other moderators allegedly acting subject to his (and thus LiveJournal's) control acted as gatekeepers by applying rules that, as a practical matter, ensured that the content that they approved was highly likely to infringe third parties' copyrights. According to Mavrix, the rules provided that the site would "accept only full reproductions of other people's articles" containing photographs of celebrities, and required users "to take" such "content from

5

'reputable [*i.e.*, well-known] third-party sources.'" 2014 WL 6450094, at *8. As alleged, these rules effectively required users to submit copyrighted material if they wanted ONTD! to post their submissions. The purpose of these rules, Mavrix alleged, was to limit the content posted to ONTD! to material most likely to drive more traffic to the site, thereby redounding to LiveJournal's financial benefit. The district court found that the record evidence before it on summary judgment did not show that Delzer and the other alleged agents exercised the kind of control that Mavrix alleged (*id.* at *7-*8 & n.6), and that the evidence did not support Mavrix's characterization of the site's rules. *Id.* at *8.

### III.   ARGUMENT

#### A.   CONGRESS ENACTED THE SAFE HARBORS TO LIMIT THE LIABILITY OF SERVICE PROVIDERS THAT ARE INNOCENT WITH RESPECT TO INFRINGING CONTENT

"Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Congress recognized that "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S. Rep. 105-190, at 20 (1998). "At the same time," Congress believed that "without clarification of their liability, service providers

may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet." *Id.*

Congress sought to ameliorate these concerns through the structure of the safe harbors, which were designed to "facilitate cooperation among Internet service providers and copyright owners to detect and deal with copyright infringements that take place in the digital networked environment." *Ellison*, 357 F.3d at 1076 (internal quotation marks omitted). In the case of § 512(c), the safe harbor limits a service provider's potential monetary liability "for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (quoting H.R. Rep. No. 105–796, at 72 (1998) (Conf. Rep.)). However, the safe harbor's protections "disappear[] at the moment the service provider loses its innocence, *i.e.*, at the moment it becomes aware that a third party is using its system to infringe. At that point, the Act shifts responsibility to the service provider to disable the infringing matter, 'preserv[ing] the strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment.'" *Id*. (alteration in original). This follows from Congress's objective that service providers as well as copyright holders would each do their part to "deal[]with

7

infringement on the Internet." *UMG Recordings v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021 (9th Cir. 2013) ("*Veoh*").

**B. EXTENDING THE SAFE HARBOR TO A SERVICE PROVIDER THAT ACTIVELY CURATES ITS SITE TO FEATURE LIKELY INFRINGING CONTENT INTENDED TO DRAW USERS TO THE SITE UNDERMINES THE PURPOSE OF THE SAFE HARBORS**

By definition, a service provider that prescreens content not for the purpose of blocking infringing material, but, rather, for curating it, is not an innocent intermediary, and is certainly not "dealing with" the problem of online infringement. Such a service provider would not be entitled to invoke the benefit of the § 512(c) safe harbor—and certainly not on summary judgment—based on the plain language of and case law construing at least three provisions of § 512(c).

**1. "Storage at the Direction of a User"**

Section 512(c) limits a service provider's monetary liability for infringement occurring "by reason of the storage *at the direction of a user* of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1) (emphasis added).

Mavrix's allegations raise the question whether, if the averred facts are true, the "storage at the direction of the user" predicate is satisfied where the service provider, rather than the user, decides what will be stored and accessible through the site.

The effect of the type of intervening process that Mavrix alleges was discussed in *Veoh*. There, the copyright owner alleged that music videos uploaded by Veoh's users infringed its copyrights. The Court held that Veoh was not barred from claiming the § 512(c) safe harbor simply because, in between the user's submission of content and its publication on the Veoh site, Veoh employed an automated process to convert the format of the submitted content into a format "readily accessible to its users." 718 F.3d at 1020 (emphasis added) (quotations omitted). Because the software automatically performed these format transformations on all submissions, without any participation or intervention by Veoh, the Court concluded that Veoh's users, not Veoh, were responsible for the storing and display of the content. The Court emphasized that Veoh did "not actively participate in or supervise file uploading, nor d[id] it preview or select the files before the upload is completed." *Id.* (quotations omitted). *See also Viacom Int'l, Inc. v. YouTube*, *Inc.*, 676 F.3d 19, 40 (2d Cir. 2012) (recognizing "force" of argument that "transactions do not occur 'at the direction of a user' within the meaning of § 512(c)(1) when they involve the manual selection of copyrighted material," but ultimately finding it unnecessary to apply that principle to facts of the case); *BWP Media USA Inc. v. Clarity Digital Grp., LLC*, No. 14-CV-00467-PAB-KMT, 2015 WL 1538366, at *8 (D. Colo. Mar. 31, 2015) (material was

stored "at the direction of a user" where service provider "did *not* pre-screen, edit, or approve any of the content at issue before it was posted") (emphasis added).

Where a service provider acts as an active gatekeeper in the manner that Mavrix alleges, material is not added to its site through an "automatic process[]" that is "initiated entirely at the volition of [its] users." *Veoh*, 718 F.3d at 1021. A service provider that curates its site on a post-by-post basis, measuring every individual submission against its own rules, is exercising its own discretion, not executing the user's "volition." If the service provider exercises that discretion with the intent to solicit and feature premium, likely copyrighted, third-party content—rather than to prevent the uploading of copyrighted content or some other legitimate purpose—then it would be inconsistent with the text and purpose of § 512 to hold that the service provider's liability arises on account of storage at the user's direction. *See id.* at 1020; *Viacom*, 676 F.3d at 40. *See also Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 518-19 (S.D.N.Y. 2013) ("*Vimeo*") (evidence that website employees served as an "editorial voice" by posting videos themselves created material issue of fact about whether videos were stored "at the direction of a user" that precluded summary judgment on DMCA safe harbor). The service provider's liability in such a case would arise based on its own conduct.

As discussed above, Mavrix alleged that LiveJournal did not attempt to "locate infringing material" and *remove* it from the site but instead, through Delzer's gatekeeping, actively prescreened every post according to rules that allowed only likely infringing material to pass through the gate. Put another way, Mavrix alleged that LiveJournal itself curated content specifically so that its site would host only high-quality, likely infringing material.

If the evidence supports Mavrix's theory, then there would be a basis for a fact-finder to conclude that material on the LiveJournal site was stored not "at the direction" of its users but rather at LiveJournal's direction—which, in turn, would preclude summary judgment for LiveJournal. On the other hand, if the evidence does not support Mavrix's allegations, this Court can decide this case without upending the settled law on when material is (or is not) stored "at the direction of a user."

### 2. Red Flag Knowledge

"Under § 512(c)(1)(A), a service provider can receive safe harbor protection only if it '(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;' '(ii) in the absence of such actual knowledge, is not aware of facts and circumstances from which infringing activity is apparent; or' '(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material." *Veoh*, 718 F.3d at

1020 (quoting 17 U.S.C. § 512(c)(1)(A)). The test for red flag knowledge "incorporates an objective standard": "whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Id.* at 1025 (quotations omitted).

Where the facts show that a service provider actively curates content according to rules that allow the posting only of likely infringing material—and where the service provider ignores clear indicia of infringement—then the provider at a minimum is aware of "facts and circumstances from which infringement is apparent," and is not eligible for the § 512(c) safe harbor.

In *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013), this Court held that a service provider who "urg[ed] his users to both upload and download particular copyrighted works," and whose site made available material that "was sufficiently current and well-known that" its infringing character "would have been objectively obvious to a reasonable person," had red flag knowledge as a matter of law. *Id*. at 1043. *See also Vimeo*, 972 F. Supp. 2d at 549 ("based on the type of music the videos used here—songs by well-known artists, whose names were prominently displayed—and the placement of the songs within the video (played in virtually unaltered form for the entirety of the video), a jury could find that Defendants had 'red flag' knowledge of the infringing nature of the videos").

12

Under *Fung*, the fact that a service provider plays an active and personal role in curating material likely to infringe—for example, by scrutinizing individual submissions under rules that require users to submit high-value, likely infringing material copied wholesale from well-known third-party sources—would present at the least a triable question of red flag knowledge. In these circumstances, material would not appear on the site unless and until the service provider made a particularized decision that the content satisfied standards making infringement "objectively obvious to a reasonable person." 710 F.3d at 1043.

If the record here supports a finding that LiveJournal actively prescreened submissions according to criteria that it adopted for the purpose of adding, not removing, likely infringing submissions, then *Fung* would preclude summary judgment for LiveJournal. If the evidence does not support Mavrix's allegations, then the Court can and should resolve this appeal without revisiting *Fung*.

### 3. "Right and Ability to Control" Infringing Activity

"A service provider is eligible for the § 512(c) safe harbor only if it 'does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'" *Veoh*, 718 F.3d at 1026 (quoting 17 U.S.C. § 512(c)(1)(B)). This Court has held that "active encouragement of the uploading of … files concerning copyrighted content" amounts to "substantial influence," showing the service

provider's "ability and right to control infringing activity." *Fung*, 710 F.3d at

1036, 1045-46 (internal quotation marks omitted). This Court also has held that a

service provider that exercises "high levels of control over activities of users" has

the same "substantial influence," likewise demonstrating the "right and ability to

control" infringing activity. *Veoh*, 718 F.3d at 1030.

     *Veoh* cited *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146

(C.D. Cal. 2002), as a case that demonstrated the "high levels of control over

users" sufficient to establish a right and ability to control infringing activity. *Veoh*,

718 F.3d at 1030. As in this case, the plaintiff in *Cybernet Ventures* owned

copyrights to photographs. Adult websites displayed those photographs without

authorization. The copyright owner asserted infringement claims against Cybernet,

which operated an age-verification service that the hosting sites used to control

visitors' access to those photographs. Cybernet "adopted a variety of guidelines

concerning the content provided by the websites using its name and services,"

including the "quality, uniqueness and adequacy of the content." 213 F. Supp. 2d

at 1159-60. Cybernet's guidelines were intended to ensure that sites in the

Cybernet network hosted pictures "of sufficient quality to provide value" to the

subscribers to its service. *Id.* at 1160. "In order for a site to be accepted into" the

Cybernet "system," Cybernet's staff "review[ed] the site." Cybernet also

"direct[ed]" operators of the sites in its network "on the appearance and content of

their sites." *Id.* at 1163-64. Noting that "Cybernet prescreens sites" and "gives them extensive advice," the district court held that Cybernet had more than the "mere ability to exclude users from the system" but instead had "the ability to control" infringing activity. *Id.* at 1181-82.

A service provider that actively reviews and prescreens each user submission for the purpose of curating likely infringing content intended to draw visitors to the site necessarily exercises "high[er] levels of control over activities of users," *Veoh*, 718 F.3d at 1030, than the service provider did in *Cybernet Ventures*. Cybernet did not review each photograph before allowing sites that were part of its network to post it, but merely created "loose and subjective" criteria for the sites in its network to follow. *Cybernet Ventures*, 213 F. Supp. 2d at 1160.

*A fortiori*, a service provider whose agents personally review each individual post submitted and select for publication only high-quality, likely infringing submissions intended to draw viewers—while disregarding facts indicating that the content is unauthorized and infringing—has sufficient control over the site's contents, and over the users who submit the content, to be disqualified from the safe harbor. *See Tur v. YouTube, Inc.*, No. CV064436 FMC AJWX, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) ("right and ability to control" standard "presupposes some antecedent ability to limit or filter copyrighted material").

If the record supports a finding that LiveJournal required users to submit content copied from third parties and pre-screened each individual submission to confirm that it met criteria strongly suggesting infringement—all in order to create a draw based on this premium content rather than to screen out infringing or inappropriate material—there would be a genuine issue about whether LiveJournal had the "right and ability to control" infringing activity that would preclude summary judgment. If there is no support for Mavrix's allegations, then the Court can and should resolve this appeal without calling the foregoing principles into question.

## CONCLUSION

The MPAA respectfully submits that, regardless of what the record shows, this Court can and should resolve this case narrowly, without upsetting well-settled law regarding the limits of safe harbor protection.

DATED: April 22, 2015          MUNGER, TOLLES & OLSON LLP

           */s/ Kelly M. Klaus*
           Kelly M. Klaus

           Counsel for *Amicus* Motion Picture
           Association of America, Inc.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B). It contains 3,575 words.

I also certify that this *amicus* brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman font in Microsoft Word 2010.

DATED:  April 22, 2015          */s/   Kelly M. Klaus*            
                                          Kelly M. Klaus

                                          Counsel for *Amicus* Motion Picture
                                          Association of America, Inc.

17

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 22, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED:  April 22, 2015                    */s/   Kelly M. Klaus*_____
                                         Kelly M. Klaus

                                         Counsel for *Amicus* Motion Picture
                                         Association of America, Inc.