No. 14-56596

# United States Court of Appeals
## for the
# Ninth Circuit

MAVRIX PHOTOGRAPHS LLC,
a California limited liability company,

*Plaintiff-Appellant,*

– v. –

LIVE JOURNAL, INC.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT CASE NO. 8:13-cv-00517-CJC-JPR

## BRIEF OF *AMICUS CURIAE* BWP MEDIA USA, INC., IN SUPPORT OF APPELLANT

CRAIG B. SANDERS (CA Bar No. 284397)
SANDERS LAW PLLC
*Attorneys for Amicus Curiae*
  *BWP Media USA, Inc.*
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.: (516) 203-7600
Fax: (516) 218-7601

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amicus Curiae* BWP Media USA d/b/a Pacific Coast News has no parent company.  It has no stock, and therefore, no publicly held company owns 10% or more of its stock.

Dated:  April 22, 2015

/s/ Craig B. Sanders
Craig B. Sanders
**SANDERS LAW, PLLC**
*Counsel for Amicus Curiae*
*BWP Media USA, Inc.*

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .......................................................1

TABLE OF CONTENTS..........................................................................................2

TABLE OF AUTHORITIES ....................................................................................3

INTEREST OF *AMICUS CURIAE*.........................................................................5

STATEMENT OF COMPLIANCE WITH RULE 29(c)(5) ....................................6

ARGUMENT ...........................................................................................................8

    I.    APPELLEE'S MODERATORS AND MAINTAINERS ARE
NOT "USERS" WITHIN THE MEANING OF THE DMCA..........................8

        A.    This Court Should Adopt The Agency Analysis Of Fung
And Vimeo To Exclude Agents As "Users" Within The
Meaning of 17 U.S.C. §512(c) ...................................................10

            1.    Agents Are Not "Users" Under 17 U.S.C. § 512(c)......................11

            2.    Compensated Individuals Are Not "Users" Under 17
U.S.C. § 512(c)...........................................................................13

        B.    A Determination That Appellees' Moderators and
Maintainers Are DMCA "Users" Would Disrupt The Balance
Of 17 U.S.C. § 512(c) And The Copyright Act ..........................14

        C.    *BWP Media USA Inc. v. Clarity Digital Group*................................15

CONCLUSION.......................................................................................................24

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32.........................25

STATEMENT OF RELATED CASES ..................................................................26

CERTIFICATE OF SERVICE ..............................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*BWP Media USA Inc. v. Clarity Digital Group, LLC*,
   2015 WL 1538366 (D. Colo. 2015) .....................................................16

*Capital Records, LLC v. Vimeo, LLC,*
   972 F.Supp.2d 500 (S.D.N.Y. 2013) ...................................... 11, 13, 15

*Chappell v. Robbins*,
   73 F.3d 918 (9th Cir. 1996) .................................................................19

*Columbia Pictures Industries, Inc. v. Gary Fung,*
   2009 WL 6355911 (C.D.Cal. 2009) *aff'd in part and modified*,
   710 F.3d 1020 (9th Cir. 2013) ......................................... 10, 11, 12, 19

*Community for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989).............................................................................19

*Io Group, Inc. v. Veoh Networks, Inc.*,
   586 F.Supp.2d 1132 (N.D.Cal. 2008) ...................................................9

*Milwaukee v. Illinois*,
   451 U.S. 304 (1981).............................................................................18

*Mobil Oil Corp. v. Higginbotham*,
   436 U.S. 618 (1978).............................................................................18

*Obodai v. Demand Media, Inc.,*
   2012 WL 2189740 (S.D.N.Y. 2012).......................................................9

*Thomas v. Metropolitan Life Ins. Co.*,
   631 F.3d 1153 (10th Cir. 2011) ...........................................................17

*U.S. v. Texas*,
   507 U.S. 529, 534 (1993)......................................................................18

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   620 F.Supp.2d 1081 (C.D.Cal. 2008) *aff'd sub nom. UMG Recordings,*
   *Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011)
   opinion withdrawn and superseded on rehearing by *UMG Recordings,*
   *Inc. v. Shelter Capital Partners LLC,* 718 F.3d 1006 (9th Cir. 2013)...................9

*Viacom Int'l, Inc. v. YouTube, Inc.,*
  676 F.3d 19 (2d Cir. 2012) ...................................................................................9


**Statutes**

17 U.S.C.
  §512(a)(1)...........................................................................................................19
  § 512(c) ................................................................................... 6, 9, 10, 12, 13, 15
  § 512(c) (1)............................................................................................................8
  §512(n) ...............................................................................................................19
  § 512(b)(1)(A)....................................................................................................19


**Other Authorities**

S.Rep. No. 105-190 (1998) ........................................................................ 9, 14, 15


**Treatises**

Restatement (Third) of Agency, § 3.01 (2006)................................................. 19, 20

## INTEREST OF *AMICUS CURIAE*

BWP Media USA d/b/a Pacific Coast News ("BWP Media") provides entertainment-related photojournalism goods and services, and owns the rights to photographs featuring celebrities that it licenses to online and print publications.[1] Like Appellant, BWP Media is also the victim of the rampant piracy of its copyrighted photographs, which are repeatedly infringed by any number of entities but, most frequently, internet service providers.

BWP Media has a particular interest in a portion of the argument advanced by Appellant: if an agency relationship exists between an internet service provider and the individual(s) posting content to the provider's website, the content was not posted "at the direction of a user" for purposes of applying the "safe harbor" protection of Section 512(c) of the Digital Millennium Copyright Act (the "DMCA") (17 U.S.C. §512(c)). Stated otherwise, where an agency relationship is found to exist (whether actual or implied), it negates an essential element of an internet service provider's right to seek safe harbor protection under the DMCA.

---

[1] Appellants and Appellees have consented to the filing of this Brief of *Amicus Curiae* BWP Media USA d/b/a Pacific Coast News In Support of Appellants.

## **STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)**

No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person or entity contributed money that was intended to fund preparing or submitting the brief.

Dated: April 22, 2015

By: /s Craig B. Sanders
*Counsel for Amici Curiae*

## SUMMARY OF ARGUMENT

Congress enacted the Digital Millennium Copyright Act ("DCMA") to update Copyright Law for the modern era. In doing so, it balanced the rights of copyright holders with those of Internet Service Providers ("ISPs") that transmit potentially-infringing material over their networks. Under the DMCA, an ISP may, in certain circumstances, escape liability for copyright infringement where the infringing content is saved on its system or network "at the direction of a user."

Case law is sparse, but the legislative history indicates that Congress intended the term "user" to encompass independent third parties, *not* ISP agents. Several District Courts have agreed, and found that certain actors like employees and website moderators are agents, and therefore not "users" within the context of the DMCA. This common sense approach honors the balance set by Congress and prevents ISP abuse of the DMCA safe harbor. It is also consistent with the precedent in this Circuit that Congress did not intend to give ISPs a competitive advantage over their terrestrial counterparts, counterparts that are held accountable to laws of general applicability.

Appellee designates certain individuals as "Moderators" and others as "Maintainers." Both Moderators and Maintainers exercise specific website-related powers that would lead a third party to reasonably believe they had the authority to act on behalf of Appellee. Under Common Law principles of agency, the

Moderators and Maintainers are undeniably agents of Appellee. As such, any content posted to the ONTD! website is not "at the direction of a user" within the meaning of the DMCA.

Because Congress did not intend to abrogate the Common Law in enacting the DMCA, nor did it, the District Court erred in finding the question of whether the Moderators and Maintainers are agents of Appellee to be irrelevant. Consequently, this Court must reverse.

## ARGUMENT

## I.    APPELLEE'S MODERATORS AND MAINTAINERS ARE NOT "USERS" WITHIN THE MEANING OF THE DMCA

Under the DMCA, an ISP may escape liability for copyright infringement if it satisfies certain statutory criteria entitling it to "safe harbor" protection from the violation.[2] *See* 17 U.S.C. § 512. If all criteria are met, the ISP has an affirmative defense to claims for infringement that occur "by reason of the storage at the direction of a **user** of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c) (1) (emphasis added).

_____

[2] "The ISP must prove that: (a) it has warned users of and implemented an effective "repeat infringer" policy; (b) it has neither actual (i.e. subjective) knowledge of specific infringing works nor "red flag" (i.e. objective) knowledge of specific infringing work; (c) it is not "willfully blind" to infringement; (d) it does not have the right and ability to control infringing activity from which it receives financial benefit; (e) it does not induce infringement; and (f) it expeditiously removes infringing works after being provided a "takedown" notice. 17 U.S.C. § 512.

8

The DMCA does not define the term "user." Neither has the judiciary precisely defined the term in the DMCA context.[3] Yet, it is clear from the statute's legislative history and resulting case law that Congress did not intend the term "user" to be understood in its common parlance. If it did, owners, employees and agents would be "users" of their own websites. However, courts have found the contrary: website owners, employees and agents (and even implied agents) are not "users" within the DMCA safe harbor provision. As Congress noted, "[i]nformation that resides on the system or network operated by or for the service provider through **its own acts or decisions** . . . does not fall within the liability limitation of [17 U.S.C. § 512(c)]." S.Rep. No. 105-190, at 43 (1998) (emphasis added).

The District Court for the Central District of California recognized the DMCA's limited definition of "user" in *Columbia Pictures Industries, Inc. v. Gary Fung,* 2009 WL 6355911 (C.D.Cal. 2009) ("*Fung*"), *aff'd in part and modified*,

---

[3] The vast majority of cases involving a defense under 17 U.S.C. § 512(c) have focused on the phrase "by reason of the storage," rather than "at the direction of a user." *See, e.g.*, *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.Supp.2d 1081 (C.D.Cal. 2008) ("*UMG I*") *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011) ("*UMG II*") opinion withdrawn and superseded on rehearing by *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* 718 F.3d 1006 (9th Cir. 2013) ("*UMG III*"); *Obodai v. Demand Media, Inc.,* 2012 WL 2189740 (S.D.N.Y. 2012) ("storage" . . . is "meant to cover more than mere electronic storage lockers"); *Viacom Int'l, Inc. v. YouTube, Inc.,* 676 F.3d 19 (2d Cir. 2012) (YouTube's software functions occurred "by reason of" user storage); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D.Cal. 2008).

710 F.3d 1020 (9th Cir. 2013) ("*Fung II*").   In *Fung II*, this Court affirmed the District Court's determination that appellant was ineligible for the DMCA's safe harbor, in part because an agency relationship existed between appellant website owner and website moderators who actually committed the infringements.  *Id.* Similarly, other courts have found that website employees are not DMCA "users." *See, e.g., Capital Records, LLC v. Vimeo, LLC,* 972 F.Supp.2d 500 (S.D.N.Y. 2013) ("*Vimeo*") (DMCA inapplicable to posts by individuals who were undisputedly employees of the defendant); *UMG Recording Inc. v. Escape Media Group, Inc.*, 2014 WL 5089743 (S.D.N.Y. 2014) (defendant liable for employee uploads despite DMCA registration).

### A. This Court Should Adopt The Agency Analysis Of Fung And Vimeo To Exclude Agents As "Users" Within The Meaning of 17 U.S.C. §512(c)

Until recently, *Fung* and *Vimeo* appear to be the only reported decisions in which a court has specifically addressed the meaning of the term "user" in the context of a safe harbor defense asserted under 17 U.S.C. § 512(c)[4].  *Fung,* 2009 WL 6355911*; Vimeo*, 972 F.Supp.2d 500 (S.D.N.Y. 2013).  In both instances, the courts examined the relationship between the website owners and the individual infringers, finding that where infringers are agents, they are not "users."  *See Fung*, 2009 WL 6355911 at *13; *Vimeo* 972 F.Supp.2d at 518.

---

[4] Excluding Clarity from D. Colorado discussed *infra.*

10

The *Amicus* respectfully urges this Court to consider the totality of the evidence and circumstances, including the purpose of the DMCA and the Copyright Act as a whole, and join the Central District of California and Southern District of New York in applying agency principles to determine if a particular actor is a DMCA "user" or merely an agent acting on behalf of the ISP.  If the former, the ISP is entitled to safe harbor protection; if the latter, it is not.  *See Fung*, 2009 WL 6355911 at *13; *Vimeo* 972 F.Supp.2d at 518.

## 1.  Agents Are Not "Users" Under 17 U.S.C. § 512(c)

The District Court for the Central District of California, in *Fung,* scrutinized the relationship been defendants and their website "moderators" and "admins," finding it significant in denying defendant's ability to avail itself of the safe harbor defense.  It held that, because the moderators and admins were under the control of defendants and were assigned duties by them, an agency relationship was created and the DMCA safe harbor protection was lost.  *Fung*, 2009 WL 6355911 at *13.

Specifically, in *Fung*, evidence showed that defendants assigned the titles of "moderator" or "admin" to certain website users.  *Id.*  Defendants "assign[ed] this status and g[a]ve these individuals authority to moderate the forums and user discussions" on the website.  *Id.*  These moderators and admins "were assigned duties related to the administration of the web forums" and, therefore, an agency

relationship existed between defendants and these individuals.      *Id.*      In so holding, the *Fung* Court stated:

> An agency relationship is created "by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." . . . Under common law principles of agency, the "moderators" were the Defendant's agents with respect to their interactions with the online message boards and forums. Even though there is no evidence that the moderators were specifically authorized to post messages in these forums, the websites' act of designating them as "moderators" and providing them with specific forum-related powers leads a "third party reasonably [to] believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."

*Id.* at n.21 (internal citations omitted).      In affirming *Fung,* this Court acknowledged the agency analysis undertaken by the District Court.[5]

Similarly, the District Court for the Southern District of New York used traditional agency principles to interpret the phrase "at the direction of a user" under 17 U.S.C. § 512(c).  *See Vimeo* 972 F.Supp.2d 500.  In *Vimeo*, the Court was tasked with deciding, *inter alia,* whether the defendant, Vimeo, LLC, was entitled to the safe harbor protections of the DMCA in an action for infringement by certain copyright plaintiffs.  The Court used common law agency principles "to

---

[5] This Court did not address that analysis, finding that there was sufficient evidence of wrongdoing by defendant himself that it did not need to rely on statements by anyone other than defendant to affirm the holding.  *See Fung II*, 710 F.3d 1020 at FN13.

determine whether . . . Vimeo's employees stored their [infringing] videos as independent 'users' or rather on behalf of the company as Vimeo staff." *Id.* at 518.

On balance, the Court found a triable issue as to:

> the extent to which the [infringed] videos at issue . . . were uploaded by Vimeo employees in their personal capacities as opposed to as agents of Vimeo. Accordingly, a triable issue has been raised with respect to whether the employees were storing their content as "users" within the meaning of 17 U.S.C. § 512(c) or [rather] as employees acting within the scope of their employment.

*Id.* at 518. In so finding, the *Vimeo* court clearly endorses the idea that agents are not "users" under 17 U.S.C. § 512(c).

### 2. Compensated Individuals Are Not "Users" Under 17 U.S.C. § 512(c)

Just as agents are not "users" under 17 U.S.C. § 512(c), neither are compensated individuals. A contrary rule would be illogical in light of the purpose of the DMCA and Copyright Act as a whole. Indeed, paying an individual for his/her contribution to a website makes such individual more akin to a freelance writer than an independent "user". Further, a bright-line rule establishing that compensated individuals are not DMCA "users" would be easily distinguishable and enforceable. This would also present the most efficient litmus test as to qualification for the safe harbor under 17 U.S.C. § 512(c) as the payment of compensation to a contributor suggests *a fortiori* that the ISP has received a

financial benefit directly attributable to the infringing activity, regardless of whether the compensation is paid at the time of submission or after.

### B. A Determination That Appellees' Moderators and Maintainers Are DMCA "Users" Would Disrupt The Balance Of 17 U.S.C. § 512(c) And The Copyright Act

Congress has carefully balanced the DMCA's safe harbor provision and the Copyright Act. In doing so, it has endeavored to protect copyright owners vulnerable to massive online piracy, while clarifying the liability of ISPs that merely transmit potentially infringing material over their networks. *See* S.Rep. No. 105-190 at 24 (1998). As the *Vimeo* Court noted,

> Congress enacted the DMCA in 1998 to "update domestic copyright law for the digital age." . . . Title II of the DMCA, codified at 17 U.S.C. § 512, seeks to "preserve[] strong incentives for service providers to detect and deal with copyright infringements that take place in a digital networked environment." . . . Congress recognized that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." . . . "[B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."

*See Vimeo* 972 F.Supp.2d at 509 (internal citations omitted). The *Vimeo* Court then acknowledged an important caveat to the potentially broad-sweeping immunity granted to ISPs by the DMCA's safe harbor, observing that:

> Section 512(c) only provides a defense against infringement that is 'by reason of the storage at the direction of a user." The applicable legislative history provides that "[i]nformation that

14

> resides on the system or network operated by or for the service
> provider through its own acts or decisions and not at the
> direction of a user does not fall within the liability limitation of
> subsection (c).

*Id.* at 517-18 (quoting S.Rep. No. 105-190, at 43 (1998).

Neither this Court nor any other Circuit Court has fully interpreted the phrase "at the direction of a user" within the meaning of 17 U.S.C. § 512(c) and the Copyright Act. However, the need for Circuit Court precedent is increasing, as is evinced from a recent decision from the United States District Court for the District of Colorado in *BWP Media USA Inc. v. Clarity Digital Group, LLC*, 2015 WL 1538366 (D. Colo. 2015) ("Clarity").

### C. *BWP Media USA Inc. v. Clarity Digital Group*

In *Clarity*, defendant Clarity Digital Group, LLC ("Clarity, LLC") owned and operated the website located at www.examiner.com ("Examiner.com"). *Clarity,* 2015 WL 1538366 at * 1. Plaintiffs filed suit against Clarity, LLC upon their discovery that more than one hundred (100) of their photographs had been illegally posted to Examiner.com, and sought damages for the infringement of their copyrights.

Clarity, LLC moved for summary judgment to dismiss the infringement claims, arguing that it was entitled to the safe harbor protections of 17 U.S.C. §517(c), based upon its contention that the infringing photographs were posted "at

the direction of a user". *See generally, id*. Plaintiffs opposed Clarity, LLC's motion for summary judgment arguing, *inter alia,* that defendant was not was entitled to the safe harbor protections of 17 U.S.C. §517(c), insofar as the photographs were not posted at the direction of a "user" as that term should be construed within the meaning of the DMCA. *Id.* at *7.

In support of their argument, plaintiffs asserted that defendant's Examiners were either *de facto* employees or agents of Clarity, LLC and, by virtue of such relationship, the conduct must be imputed directly to Clarity.

The undisputed evidence in *Clarity* showed that the content on Examiner.com is produced by contributing authors, which Clarity, LLC refers to as "Examiners." *Id.*at *1. The evidence further showed that, in order to become an Examiner, an interested person must, *inter alia,* submit an application, writing sample, pass a background check and enter into an "Independent Contractor Agreement and License" (the "Examiner agreement") before being granted an express license to post to the site. *Id.* Once an individual has passed the application and background check and signed the Examiner Agreement, the Examiner becomes eligible to be paid by the defendant for the submission of "works", which compensation is determined by a number of factors, including revenue, subscriptions, sponsorship, page view traffic, and session length attributable to the "works". *Id.* at *2. Moreover, the evidence showed that

16

defendant controlled the format of all posts on the website and had to approve same in an email to an Examiner prior to posting. *Id.*

In light of the fact that only Examiners had the ability to post content to the website, coupled with the fact(s) that the content submitted by Examiners was controlled by defendant, and that Examiners shared revenue with defendant based upon the amount and quality of traffic their "works" drove to the website, plaintiffs argued that Examiners are not "users" within the meaning of the DMCA but, rather, were agents or *de facto* employees of defendant. *See, generally, id.* Plaintiffs argued that, although the term "user" is not defined by the DMCA, the context of the term within the statute undeniably suggests that the term was not intended to have its common meaning but, rather, is a legal term of art.

The District Court acknowledged that §512(c) does not define "user" and also that no court has squarely construed the term. *Id.* at *6. The District Court nonetheless rejected plaintiffs' argument finding that where "the statutory language is clear, our analysis ends and we must apply its plain meaning." *Id.* quoting *Thomas v. Metropolitan Life Ins. Co*., 631 F.3d 1153, 1161 (10th Cir. 2011). In finding the statutory language to purportedly be clear, the District Court adopted the dictionary definition of the term, *to wit,* "one that uses." *Id.* Plaintiffs argued that such construction cannot be either correct or intended, as owners and employees would be "users" of a system under that definition, yet courts have held

17

that owners or employees are not "users".  *See, e.g., Vimeo, supra; Fung, supra*;

*Capitol Records, Inv. v. MP3tunes, LLC*, 821 F.Supp.2d 627 (S.D.N.Y. 2011),

*modified on reconsideration on other grounds* by 2013 WL 1987225 (S.D.N.Y.

2013),

    The District Court rejected this argument as well, holding that the need to

distinguish between "storage at the direction of the service provider" and "storage

at the direction of third parties" need not be resolved by construing the definition

of the word "user."  *Clarity,* 2015 WL 1538366 at *7.  Instead, the court held

> Congress knew how to make such a distinction without
> mentioning "user." Both §§ 512(a)(1) and 512(b)(1)(A) utilize
> the phrase "a person other than the service provider" to
> differentiate between the service provider and other persons.

*Id.*

    There are at least two problems with the District Court's holding in this

regard.  <u>First</u>, as this Court has noted, where Congress intends to abrogate the

common law, it must give "clear indication" of its intent to do so.  *See, e.g.,*

*Chappell v. Robbins*, 73 F.3d 918, 923 (9th Cir. 1996); *U.S. v. Texas*, 507 U.S. 529,

534 (1993) ("In order to abrogate a common-law principle, the statute must "speak

directly" to the question addressed by the common law") citing *Mobil Oil Corp. v.*

*Higginbotham*, 436 U.S. 618 (1978); *Milwaukee v. Illinois*, 451 U.S. 304 (1981).

In the case of the DMCA, it is clear that Congress expressed a clear intention to not

abrogate the Common Law, as 17 U.S.C. §512(l) expressly states that other defenses are not affected by the limitations on liability set out in the statute.

Second, the District Court's citation to Sections 512(a)(1) and 512(b)(1)(A) to support its conclusion that 'Congress knew how to make such a distinction without mentioning "user"' expressly contradicts the rules of construction set out in the statute itself. Specifically, 17 U.S.C. §512(n) provides:

> Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

17 U.S.C. §512(n).

In *Clarity,* there can be little doubt that Examiners were agents of Examiner.com.

> An agency relationship is created "by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf

*Fung,* 2015 WL 6355911 at FN21, quoting Restatement (Third) of Agency, § 3.01 (2006) and citing *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 & n. 31 (1989) (looking to Restatement to determine federal common law of agency under Copyright Act).

An agency relationship can also be implied, and arises when a principal "leads a third party reasonably to believe the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Fung,* 2015 WL 6355911 at FN21, quoting Restatement (Third) of Agency, § 2.03 (2006) (describing "apparent authority") ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.") "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Id.*

The error committed by the court below is analogous to the error committed by the *Clarity* Court. Appellee operates a web-based social media platform that allows members to create and contribute to online groups called "communities" [Docket 63 at 2]. "Oh No They Didn't!" ("ONTD") is one such community, centered on celebrity gossip and pop culture [Id. at 21]. ONTD, like many of Appellee's communities, has "Moderators" and "Maintainers" [Id. at 6-7].[6]

Under Appellee's own rules, the owner of a community has complete authority to choose Maintainers; the owner and Maintainers have complete

---

[6] All communities have maintainers; some communities have moderators. ONTD has both maintainers and moderators.

authority to choose Moderators [Docket 74 at 14]. ONTD is currently owned by "pinky," a user name created by Appellee's parent company [Id. at 19-20].[7] The "Head Maintainer" for ONTD is Appellee's employee Brenden Delzer ("Delzer") [Id.]. Through "pinky" and Delzer, Appellee has complete control over the group's rules, Moderators andMaintainers, and content.

Moderators and Maintainers sift through member-submitted posts, deciding which to approve or reject based on the community guidelines and rules [Id. at 4].[8] Posts are published upon approval by Moderator-Maintainers (not from the time of submission by members); Moderators and Maintainers choose every piece of content that "goes live" on the site [Docket 63 at 29]. Additionally, Maintainers are empowered to delete already-approved posts and remove or ban members from participating in the community [Docket 74 at 2]. As head Maintainer, Appellee's employee Brenden Delzer instructs other Moderators and Maintainers regarding which member submissions to approve and which to reject.

---

[7] Before "pinky" was installed as ONTD's owner, the community was owned by Brenden Delzer [Docket 74 at 19-20].

[8] Rules are set by each community's owner and maintainers [Docket 63 at 23]. As "head maintainer," Appellee's employee Delzer controls ONTD's rules. ONTD rules require posts to contain entire articles copied from other websites; Maintainers and Moderators reject submissions that do not conform to this rule [Docket 74 at 7-8].

Here, Appellee's Moderators and Maintainers enjoy privileges and powers with respect to the website that contributors, visitors and ordinary users do not have.

Pursuant to common law agency principles, Moderators and Maintainers are Appellee's agents as they interacted with members of the ONTD community because, as in *Fung*, Appellee's "act of designating them as [Moderators and Maintainers] and providing them with specific [community] related powers, leads a 'third party reasonably [to] believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[9] *Id.* The same was true of the Examiners in *Clarity,* who were selected and screened by Clarity, LLC, prior to entering into an independent contractor agreement, which granted the Examiners (and only the Examiners) a license to post content to the website. Thereafter, the Examiners were paid by Clarity, LLC for their contributions.

The evidence in this case shows that Appellee's Moderators and Maintainers are Appellee's agents. Therefore, a determination that Moderators and/or Maintainers are DMCA "users" would result in an unprecedented expansion of the DMCA's safe harbor, which was already done by the District Court in *Clarity*,

---

[9] Moderator-Maintainers enjoy "certain administrative permissions relative to [the ONTD] community that allow [them] to, for example, add new maintainers, delete posts or comments, and remove or ban users from participating in the community" [Docket 63 at 5].

because if an agency relationship is found to exist, the agent's actions are attributable to the principal, thereby negating any possibility that the storage was at the direction of a "user." But for this logical distinction between agents and DMCA "users," ISPs would be incentivized to convert all employees into independent contractors, thereby converting them into DMCA "users" and guaranteeing, for themselves, the liability shield of the DMCA's safe harbor. In other words, unless this Court finds that agents are not "users" within the meaning of 17 U.S.C. §512(c), it will result in an evisceration of the protections afforded by Copyright and a disruption of the balance between the two.

## **CONCLUSION**

The totality of evidence and circumstances, including the purpose of the DMCA and Copyright Act as a whole, supports the idea that neither agents nor compensated individuals are "users" under 17 U.S.C. § 512(c). Appellee's Moderators and Maintainers are Appellee's agents; therefore, they are not § 512(c) "users" and Appellee is not entitled to the protections of the DMCA safe harbor.


Dated: April 22, 2015

Respectfully submitted,

**SANDERS LAW PLLC**

/s/ Craig B. Sanders
Craig B. Sanders
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
Telephone: (516) 203-7600
Facsimile: (516) 218-7601

24

## <u>CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32</u>

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X] this brief contains 3,941 words per the Microsoft Word Count function, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[  ] this brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font, *or* [  ] this brief has been prepared in a monospaced typeface using with _____.

Dated: April 22, 2015

**SANDERS LAW PLLC**

<u>/s/ Craig B. Sanders</u>
Craig B. Sanders
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
Telephone: (516) 203-7600
Facsimile: (516) 218-7601

## <u>STATEMENT OF RELATED CASES</u>

Amicus Curiae is not aware of any related cases.


Dated: April 22, 2015

                                   **SANDERS LAW PLLC**

                                   <u>/s/ Craig B. Sanders</u>
                                   Craig B. Sanders
                                   100 Garden City Plaza, Ste. 500
                                   Garden City, NY 11530
                                   Telephone: (516) 203-7600
                                   Facsimile: (516) 218-7601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 22, 2015.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 22, 2015

**SANDERS LAW PLLC**

/s/ Craig B. Sanders
Craig B. Sanders
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
Telephone: (516) 203-7600
Facsimile: (516) 218-7601