No. 14-56596

IN THE

# United States Court of Appeals for the Ninth Circuit

_____

MAVRIX PHOTOGRAPHS LLC,

*Plaintiff-Appellant*,

v.

LIVEJOURNAL, INC,

*Defendant-Appellee*.

_____

From the United States District Court
For the Central District of California,
Case No. 8:13-cv-00517
Honorable Cormac J. Carney Presiding

_____

**BRIEF FOR APPELLEE LIVEJOURNAL, INC.**

_____

Blaine H. Evanson
Brandon J. Stoker
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-1512
Telephone: (213) 229-7000
bevanson@gibsondunn.com
bstoker@gibsondunn.com

Wayne M. Barsky
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, California 90067-3026
Telephone: (310) 552-8500
wbarsky@gibsondunn.com

*Attorneys for Defendant-Appellee LiveJournal, Inc.*

## CORPORATE DISCLOSURE STATEMENT

LiveJournal, Inc. is a wholly owned subsidiary of SUP Media, a privately held company based in Russia.

# TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT .....................................................................5

ISSUES PRESENTED..........................................................................................6

STATEMENT OF THE CASE..............................................................................7

I.      Factual Background .................................................................................7

II.     Procedural History ................................................................................14

SUMMARY OF ARGUMENT ..........................................................................19

STANDARD OF REVIEW ................................................................................21

ARGUMENT ......................................................................................................22

I.      Congress Created the DMCA Safe Harbors to Protect Good-Citizen
        Service Providers Like LiveJournal ...............................................22

II.     The Trial Court Correctly Ruled That Section 512(c) Immunizes
        LiveJournal from Liability for Infringing Material Stored by Users ...........26

        A.      The Allegedly Infringing Photographs at Issue Here Were
                Stored on LiveJournal's System at the Direction of Users ................27

        B.      LiveJournal Had No Specific Knowledge of the Alleged User
                Infringement at Issue ..........................................................................41

        C.      LiveJournal Had No "Red Flag" Knowledge of the Alleged
                User Infringement at Issue .................................................................48

        D.      LiveJournal Does Not Receive Any Financial Benefit Directly
                Attributable to the Infringing Activity ...............................................53

        E.      LiveJournal Lacks the Right or Ability to Control the Infringing
                Activity ...............................................................................................56

## TABLE OF CONTENTS
(continued)

Page

III.   The District Court Acted Within Its Discretion in Denying Mavrix's
       Request to Unmask the Identities of Anonymous, Third-Party Users ..........59

       A.   Mavrix Failed to Provide Notice of Its Motion to Compel to the
            Anonymous LiveJournal Users ............................................................59

       B.   LiveJournal Users' Rights to Privacy and Anonymity Outweigh
            Any Interest in Unmasking Their Identities .......................................62

CONCLUSION .........................................................................................................64

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aimster Copyright Litig.*,
  252 F. Supp. 2d 634 (N.D. Ill. 2002) ...................................................36

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) ........................................ 59, 62, 63, 64

*Arista Records v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)............................................................ 60, 61

*Arizona v. City of Tucson*,
  761 F.3d 1005 (9th Cir. 2014) ......................................................... 21, 59

*Art of Living Found. v. Does 1-10*,
  2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) .....................................64

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980)...............................................................................61

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ................................................... *passim*

*Costar Grp., Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001) .................................. 27, 33, 34, 41

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004)............................................ 27, 33, 34, 41

*Curley v. City of N. Las Vegas*,
  772 F.3d 629 (9th Cir. 2014)................................................................21

*Doe v. Cahill*,
  884 A.2d 451 (Del. 2005) ............................................................. 60, 64

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) ................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Ford v. MCI Commc'ns Corp. Health & Welfare Plan*,
  399 F.3d 1076 (9th Cir. 2005) ................................................................6

*Highfields Capital Mgmt. L.P. v. Doe*,
  385 F. Supp. 2d 969 (N.D. Cal. 2005) ..................................................63

*Indep. Newspapers, Inc. v. Brodie*,
  966 A.2d 432 (Md. 2009) ......................................................................60

*Io Grp., Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) ...................................... *passim*

*Krinsky v. Doe 6*,
  159 Cal. App. 4th 1154 (2008) .............................................................60

*Malloy v. Fong*,
  37 Cal. 2d 356 (1951) ...........................................................................39

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster*,
  545 U.S. 913 (2005) ....................................................................... 50, 51

*Morris v. Morgan Stanley & Co.*,
  942 F.2d 648 (9th Cir. 1991) ..................................................................6

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ....................................................... 26, 53

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................................57

*Reno v. Am. Civil Liberties Union*,
  521 U.S. 844 (1997) ..............................................................................61

*SaleHoo Grp., Ltd. v. ABC Co.*,
  722 F. Supp. 2d 1210 (W.D. Wash. 2010) ..................................... 60, 61

*Stewart v. Cate*,
  757 F.3d 929 (9th Cir. 2014) ................................................................21

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) .................................................... *passim*

iv

## TABLE OF AUTHORITIES
(continued)

Page(s)

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
  665 F. Supp. 2d 1099 (C.D. Cal. 2009) ...............................................43

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ........................................................ 42, 47, 48

**Statutes**

17 U.S.C. § 401(b) ........................................................................46

17 U.S.C. § 512(c)(1) ................................................... 24, 28, 35, 38

17 U.S.C. § 512(c)(1)(A)(ii) ......................................................48

17 U.S.C. § 512(c)(1)(B) ...................................................... 53, 56

17 U.S.C. § 512(c)(1)(C) ............................................................23

17 U.S.C. § 512(c)(3)(A)(iii) .....................................................43

17 U.S.C. § 512(c)(3)(B)(i) ........................................................43

17 U.S.C. § 512(i)(1) ..................................................................26

17 U.S.C. § 512(i)(2) ..................................................................26

17 U.S.C. § 512(k)(1) .................................................................37

17 U.S.C. § 512(m) ............................................................... 36, 43

**Rules**

Fed. R. App. Proc. 4(a)(2) ...........................................................6

Fed. R. Civ. Proc. 58(c)(2)(B) .....................................................6

**Legislative Reports**

H.R. Rep. 105-551, pt. 2 (1998) .......................................... 23, 37

S. Rep. No. 105–190 (1998) ................................................. 23, 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

12B Nimmer on Copyright (2009)......................................................... 37, 44

**INTRODUCTION**

Plaintiff Mavrix Photographs LLC relies on a distorted characterization of the online service provided by LiveJournal, Inc. and a misapprehension of the "safe harbors" that Congress created for online service providers in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C § 512 *et seq.*

LiveJournal operates a free, web-based social media, blogging, and community publishing platform that falls squarely within the safe harbor of 17 U.S.C. § 512(c). LiveJournal does not itself upload or direct the upload of any content; rather, it hosts online "communities"—user-driven forums that allow users to post content for commentary and discussion. Communities are created by LiveJournal users, and in many cases the communities' users appoint moderators and even establish rules that will govern the posts on the community forums. But LiveJournal has no role in the material that is posted to the forums or the rules that communities choose to create; LiveJournal is simply the online service provider that hosts the communities.

Congress created the safe harbor of Section 512(c) to give service providers like LiveJournal, YouTube, and Facebook "greater certainty … concerning their legal exposure" for specific acts of infringement by users. *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). The centerpiece of the DMCA safe harbors is a notice-and-takedown procedure, which places the "burden of policing

copyright infringement … squarely on the owners of the copyright" by requiring owners like Mavrix to "identify specific infringing material to service providers." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1022, 1037 (9th Cir. 2013). Where a copyright owner provides notice that a copyrighted work is being displayed on the service provider's website, the service provider must expeditiously remove or disable access to that work. But where a copyright owner sends no such notice, and a qualifying service provider does not otherwise have knowledge of the allegedly infringing material stored on its system, Section 512(c) precludes "imposing monetary liability … for copyright infringement." *Id.* at 1014.

This lawsuit concerns one of the 2.6 million communities hosted on LiveJournal (www.ohnotheydidnt.livejournal.com ("ONTD!")). Mavrix alleges that users posted seven sets of infringing photographs on ONTD! over the span of three years. Mavrix did not utilize the DMCA's "notice and takedown" procedure, but rather filed suit without providing LiveJournal any advance notice of the allegedly infringing material at issue. Nonetheless, upon learning of the alleged infringement through Mavrix's pleadings, LiveJournal immediately disabled access to the material at issue as if it had received such notice.

The district court granted summary judgment to LiveJournal on Mavrix's copyright infringement claim, because "it is undisputed that third-party *users*

selected the content for the seven posts in question, created the posts, and uploaded the posts to LiveJournal's service." And because "LiveJournal is simply the operator of an online platform on which anyone can … start a group blog," and does not "solicit any specific infringing material from its users," the court ruled that "LiveJournal is entitled to the § 512(c) safe harbor."

Mavrix claims that a service provider that actively "curates" user posts with the intent to solicit and feature infringing materials should be denied the protections of the Section 512 safe harbor. That may be true; the MPAA correctly notes that a service provider that in fact "curates" user posts "with the intent to solicit and feature premium, likely copyrighted, third-party content—rather than to prevent the uploading of copyrighted content or some other legitimate purpose," may be engaging in conduct "inconsistent with the text and purpose of § 512." Br. of Amicus Curiae Motion Picture Association of America, Inc. ("MPAA") at 10. But the district court rejected Mavrix's effort to characterize the LiveJournal service in this manner, and the undisputed facts demonstrate that LiveJournal did not "curate" the material in its communities, but rather that LiveJournal is *exactly* the type of service provider that Section 512(c) was meant to protect. LiveJournal prohibits infringement in its Terms of Service, actively educates its users about the misuse of copyrighted materials, promptly removes infringing material upon notice

from copyright owners, and employs an Abuse Team that removes repeat infringers from its system.

Mavrix's argument that LiveJournal "curates" infringing material is based on rules that purportedly "instruct" or "require" users to post copyrighted material. But the "rules" that Mavrix refers to are *not* LiveJournal's rules; they are *user-generated* guidelines adopted by members of the ONTD! community. It is undisputed that LiveJournal had no role in the creation of these guidelines, does not police users' compliance with those guidelines, and imposes no other rules on ONTD! users other than its Terms of Use, which expressly *prohibit* copyright infringement.

Moreover, even the guidelines Mavrix points to do not encourage copyright infringement. They simply ask ONTD! users to cite their sources and include referenced material in their posts as a starting point for discussion. Mavrix's claim that these guidelines "require" users to infringe is belied by the undisputed fact that users upload scores of non-infringing content on a daily basis, including original commentary, user photographs, embedded or linked videos, and other material not subject to copyright.

Mavrix makes much of the fact that one of the eight ONTD! moderators, Brenden Delzer, is now an employee of LiveJournal. But Mr. Delzer did not upload or ask anyone to upload the allegedly infringing material at issue. He has

no recollection of reviewing these materials in his capacity as a moderator, and Mavrix has never offered evidence disputing this fact. He became an employee of LiveJournal long *after* the rules that Mavrix relies on were adopted by the ONTD! community. Thus, as the district court found, there is no credible evidence that Mr. Delzer had any involvement whatsoever in the selection, upload, or review of the posts at issue, and his role as a moderator therefore cannot be used to hold LiveJournal responsible for its users posting copyrighted material to the ONTD! community forum.

* * *

LiveJournal is exactly the kind of service provider that Congress meant to shield from liability in enacting the Section 512(c) safe harbor provision. By contrast, Mavrix's sidestepping the DMCA notice-and-takedown procedure and attempt to hold LiveJournal liable for alleged copyright infringement by its users would "shift [the] substantial burden" of policing infringement from copyright owners to service providers, which Congress specifically rejected in enacting the DMCA. *UMG Recordings*, 718 F.3d at 1022. This Court should affirm.

## JURISDICTIONAL STATEMENT

On September 19, 2014, the district court entered its order granting LiveJournal's motion for summary judgment and denying Mavrix's motion for partial summary judgment. Appellant's Excerpts of Record ("ER") at 43–60.

5

Because the district court did not enter judgment on a separate document pursuant to Federal Rule of Civil Procedure 58(a), the order granting summary judgment did not become final until February 16, 2015—150 days after its entry on the docket. *See* Fed. R. Civ. Proc. 58(c)(2)(B). Consequently, Mavrix's notice of appeal, filed on October 2, 2014, was premature.

Pursuant to Federal Rule of Appellate Procedure 4(a)(2), Mavrix's premature notice is treated as filed when the district court's order later became final on February 16, 2015. Fed. R. App. Proc. 4(a)(2); *see Ford v. MCI Commc'ns Corp. Health & Welfare Plan*, 399 F.3d 1076, 1081 (9th Cir. 2005). This Court accordingly now has jurisdiction under 28 U.S.C. § 1291. *Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 654 (9th Cir. 1991).

## ISSUES PRESENTED

1.     Whether the district court correctly determined that LiveJournal is shielded from liability for copyright infringement under 17 U.S.C. § 512(c) for material stored "at the direction of a user" on LiveJournal's system or network.

2.     Whether the district court acted within its discretion to deny Mavrix's motion to compel responses to interrogatories seeking to unmask the identities of seven anonymous user-moderators.

6

## STATEMENT OF THE CASE

Mavrix filed this action on April 1, 2013, alleging that LiveJournal is liable for copyright infringement arising from several sets of photographs that were posted by its users to an online community hosted by LiveJournal. 15ER3135–74. The operative complaint was filed on August 23, 2013. 15ER3069–3134; 12ER2369–70. Mavrix moved to compel the disclosure of identifying information for several anonymous third-party users of LiveJournal's online service on April 22, 2014 (15ER3055–56) and again on May 22, 2014 (14ER2924–25). Magistrate Judge Jean P. Rosenbluth denied both motions, on May 12, 2014 (14ER2928–30) and June 12, 2014 (14ER2795), respectively. Mavrix moved for review of both orders on June 26, 2014, which the district court upheld on July 22, 2014. 14ER2760–61; 1ER61–64.

LiveJournal moved for summary judgment and Mavrix moved for partial summary judgment on June 30, 2014. 12ER943–2427. The district court granted LiveJournal's motion and denied Mavrix's motion on September 19, 2014. 1ER43–60.

## I.    Factual Background

1. LiveJournal operates a free, web-based social media platform where millions of users can create personalized online "journals" or "communities" around specific topics or shared interests. 1ER45. LiveJournal *hosts* journals and

7

communities on its system; LiveJournal's *users* decide how to run their own journals and communities. Users post their own content to personal journals or communities they join, and comment on content posted by other users. 1ER44–45. LiveJournal hosts more than 14 million journals and 2.6 million communities. 1ER45; 12ER2329.

Self-expression, creativity, and community are among LiveJournal's core values. 8ER1427.[1] Primarily a forum for social interaction and online discussion, LiveJournal is driven by user comments to posts generated by other users in personal journals and communities. 12ER2345, 2390–92.

All of LiveJournal's core features—including posting entries or comments, and creating or participating in communities—are free of charge. 12ER2327–28, 2330. LiveJournal also offers users the option of purchasing "[p]aid accounts," which provide certain additional features, such as extra options for customizing the look of personal journals and communities and a "@livejournal.com" email forwarding address, among others. 12ER2328. In addition to receiving revenue from the sale of such accounts and other premium features to users, LiveJournal

---

[1] In Russia, for example, LiveJournal hosts more than 80 of the top 100 most popular blogs in the country, and provides journalists and opposition politicians a rare forum for sharing news, criticizing the government, and otherwise communicating freely. 8ER1427; 12ER2329.

receives revenue from advertising displayed across its service in both journals and communities. 12ER2330–31.

A community can institute its own guidelines and rules for posting and commenting in that community, provided that they are not in conflict with LiveJournal's Terms of Service. 1ER45–46; 12ER2348. Every community has at least one user who acts as a "maintainer" with administrative privileges that allow him or her to add new maintainers, delete posts or comments, and remove or ban users from the community. 1ER45; 12ER2331.

All LiveJournal users are subject to LiveJournal's Terms of Service (1ER45; 12ER2334), which expressly prohibit, among other things, the posting of content that infringes any copyright of a third party. 1ER46; 12ER2334–35. LiveJournal takes steps to limit infringement on its system, such as providing answers to "Frequently Asked Questions" about copyright infringement and LiveJournal's Copyright Abuse Policy. *See*, *e.g.*, 4ER600–01, 659.

LiveJournal has in place a policy to terminate the accounts of users who are repeat copyright infringers, even going so far as to block repeat infringers' IP and email addresses so they cannot register a new LiveJournal account. 1ER46; 12ER2335–36. LiveJournal also provides contact information and a designated agent to assist copyright owners in submitting notices of copyright infringement pursuant to the DMCA. 1ER46; 12ER2338–39. Upon receipt of a DMCA-

compliant "takedown" notice, LiveJournal promptly disables the material claimed to be infringing, typically within 24 hours and no longer than three days, pursuant to its internal policy. 1ER46; 12ER2339–41.

2. ONTD! is a LiveJournal community focused on discussion of celebrity gossip and pop culture and has more than 99,000 members worldwide. 1ER46; 12ER2342. Users on ONTD! create, on average, 100 to 120 new posts each day, which serve as starting points for community discussion. 1ER46; 12ER2344–45. A single post can generate thousands of comments from within the community. 1ER46; 12ER2345.

The primary purpose and draw of ONTD! is the unique user commentary and active dialogue among its members. 4ER548; 12ER2345–46, 2390–91. Members of ONTD! post and comment on a diverse array of user-generated material, such as users' photographs and original commentary, and other non-infringing material, including embedded (*i.e.*, linked) videos. 12ER2346.

Like many other communities hosted on LiveJournal's system, members of the ONTD! community have chosen to be moderated. 1ER45; 12ER2332. When a user submits a post to ONTD!, the post is uploaded to LiveJournal's servers and placed in a queue for review by a moderator. 1ER45; 8ER1483; 12ER2354. Any moderator can accept or reject a post; if accepted, it becomes visible to the community. 1ER45; 12ER2354–55. Any maintainer has the ability to remove a

moderator, but the decision is generally made by all maintainers and moderators as a group. 1ER45; 12ER2357–59. A moderator may be removed if, for instance, he or she no longer actively participates in the community. 1ER45; 12ER2351–58.

With the exception of Brenden Delzer (discussed in more detail below), all the moderators are third-party users who volunteer without compensation to moderate the discussion within the community by approving or rejecting posts uploaded by other users. 1ER45; 12ER2354. There are currently nine moderators and six maintainers of the ONTD! community. 1ER46; 12ER2352. ONTD! does not have a primary leader; instead, decisions for the community are made by group consensus of the moderators and maintainers. 9ER1616–17; 12ER2352–53.

Moderators do not pick and choose what content to upload to the ONTD! community. Rather, this is done by *users* who select and upload their content to LiveJournal's system, which becomes visible once approved by a moderator. 1ER45; 8ER1483; 12ER2354. Moderators also do not have the ability to modify or edit a post uploaded by another user (1ER45; 12ER2331, 2359–60), but the user who uploaded the post always retains the ability to edit the content of that post, even after it has been approved by a moderator. 1ER45; 12ER2359–60.

Moderators frequently reject posts that are obviously infringing or that cite material from copyright owners that have asked not to be used as a source for information posted on ONTD!. 8ER1484–85; 12ER2349–51. Moderators also

11

review user-submitted posts to determine whether an uploaded post is consistent with the basic guidelines of the community.  1ER45; 12ER2354.

ONTD! community members have developed a set of guidelines that, *inter alia*, allow moderators to reject posts that are spam, pornographic, harassing, duplicative, or off-topic for the community.  1ER46; 12ER2361.  Two guidelines at issue state, "Don't be lazy with your posts.  Include the article and picture(s) in your post ... do not simply refer us off to another site for the goods," and "You must provide a source" with a "full and direct" URL when the content comes from another website.  1ER57–58; 7ER1115–17.  These guidelines were intended to discourage users from "just [posting] a URL" rather than "a starting off point for the post for people to comment on" (1ER57–58; 7ER1180), and to enable users and moderators to judge the accuracy of posted content (such as celebrity news or gossip) and to screen out obviously infringing content from proprietary websites.  7ER1202–07; 8ER1484–85; 12ER2349–51.  Moderators do *not* require sources, however, where content is generated by users, such as original photographs or commentary.  *See*, *e.g.*, 7ER1203–04.

LiveJournal does not create, edit, or police guidelines adopted by users of any community, including ONTD!.  1ER57–58; 12ER2348–49.  Nor does it monitor or review which posts are accepted or rejected by community moderators.  12ER2364.  Indeed, LiveJournal has no technical means of tracking which

12

moderator approves what posts. 1ER47; 12ER2366. LiveJournal merely provides the platform on which ONTD! and millions of other communities operate, and it has no role in ONTD! users' decisions to enforce—or not to enforce—their own community guidelines. 1ER56, 60; 12ER2365.

Mr. Delzer became an employee of LiveJournal in March 2010 after several years of acting as a volunteer moderator of the ONTD! community. 1ER47; 12ER2351–52. Although he is an employee of LiveJournal, Mr. Delzer exercises the same administrative privileges as other ONTD! moderators, and approves or rejects posts according to the same guidelines as the volunteer moderators. 1ER45, 56–57; 12ER2331.

Mr. Delzer did not develop the ONTD! community rules, which were created long *before* he began participating in the community or became employed by LiveJournal. 12ER2349. He is actively involved in the ONTD! community, but does not review or approve every post to the site, and does not recall reviewing or approving any of the allegedly infringing posts at issue. 1ER47 & n.5.

3. Mavrix is a California limited liability company formed to pursue copyright litigation for the benefit of non-party Mavrix Photo, Inc., a celebrity photo licensing agency. 4ER723–25; 12ER2382–84, 2412. In addition to licensing photos of celebrities taken by freelance photographers, Mavrix attempts

to obtain and register copyrights in certain of the photos it licenses. 12ER2412; 9ER1636–38.

Mavrix Photo, Inc. contacted LiveJournal on January 23, 2009 to request the removal of a copyrighted photo uploaded by a user to a LiveJournal community. 4ER723–24. LiveJournal promptly responded that the photo in question had been removed. *Ibid.* Mavrix has not sent a single DMCA takedown notice to any service provider since it hired its current counsel in 2009 or 2010. 4ER725. Instead, since May of 2010, Mavrix has filed at least thirty-seven other lawsuits alleging copyright infringement against various online entities. 12ER2412; 8ER1409–16; 9ER1738; 12ER2325.

## II. Procedural History

1. Mavrix filed this lawsuit on April 1, 2013, alleging that LiveJournal was liable for copyright infringement on the basis of seven user-generated posts uploaded to ONTD! between 2010 and 2014, which included 40 celebrity photos that Mavrix allegedly licensed to various online and other entities. 1ER46; 5ER836–97; 12ER2369; 15ER3135–74.

One post, for instance, includes candid photographs of celebrity Kathy Griffin dancing topless in the rain:

14



5ER870 (cover added).

Another post, entitled "Katy Perry's colorful rooftop photoshoot," includes candid photographs of celebrity Katy Perry participating in *another* photographer's professional photoshoot:



5ER853.

Mavrix filed this lawsuit without providing any notice to LiveJournal that these user-generated posts to a LiveJournal-hosted community allegedly infringed its copyrights. 12ER2370–75.

Following a successful motion to dismiss by LiveJournal, Mavrix filed its First Amended Complaint on August 23, 2013, which pleaded new claims of infringement based on three additional user-generated posts. 12ER2369–70, 2376–81. Mavrix filed the operative Supplemental First Amended Complaint on July 9, 2014, pleading a new claim of infringement based on a user-generated post to

ONTD! that purportedly infringed the copyright of an additional set of photos. 5ER827–35.

On September 22, 2014, the district court granted LiveJournal's motion for summary judgment and denied Mavrix's motion for partial summary judgment. The court held that LiveJournal was entitled to the protection of the Section 512(c) safe harbor, because "[i]t is undisputed that third-party *users* selected the content for the seven posts in question, created the posts, and uploaded the posts to LiveJournal's service." 1ER52 (emphasis added). "That all posts had to be approved by a moderator before becoming visible on the site, does not disqualify LiveJournal under the 'broad' statutory language of the DMCA safe harbor for 'infringement … by reason of the storage at the direction of the user.'" *Ibid.*

The court found no evidence supporting Mavrix's argument that LiveJournal had actual or red-flag knowledge of infringement, because the images are "candid photographs of celebrities in public settings, unposed, mostly taken from the back or the side without the subject looking at the camera," and could have been "taken by any member of the public with a digital camera or smartphone." 1ER54. Instead, the "evidence before the Court shows neither high levels of control by LiveJournal nor LiveJournal inducing its users to commit copyright infringement." 1ER56.

17

The court was unpersuaded by the fact that Mr. Delzer is an employee of LiveJournal, emphasizing that he "is merely one of six maintainers with the same administrative privileges for ONTD!, and merely one of eight ONTD! users with moderator powers." 1ER56. The court rejected Mavrix's claim that Mr. Delzer is the "master" of the other moderators and that he "controls" the ONTD! community, concluding that the evidence "hardly shows the level of control that could exert 'substantial influence' over the activities of LiveJournal's users." 1ER57.

The court also rejected Mavrix's argument that ONTD! guidelines asking users to include cited content and full citations "require" users to upload infringing content, concluding that these rules are "a far cry from the type of intentional inducement that has been found to disqualify a service provider" from the safe harbor. 1ER58. Because "LiveJournal is simply the operator of an online platform on which anyone can … start a group blog based on shared interests," and does not actively induce infringement, "LiveJournal is entitled to the § 512(c) safe harbor for the seven allegedly infringing posts." 1ER60.

2. On March 6, 2014, Mavrix served interrogatories seeking the "name, address, and telephone number" of six anonymous third-party moderators of the ONTD! community. 15ER3020–29. LiveJournal objected to the interrogatories,

arguing that the anonymous users have both privacy rights and a First Amendment right to utilize LiveJournal's service anonymously. *Ibid.*

Mavrix filed its first motion to compel on April 22, 2014 (15ER3055–56), which the Magistrate Judge denied on May 12, 2014, because "Plaintiff did not meet and confer in good faith before filing th[e] motion." 14ER2902. Mavrix filed its second motion to compel on May 22, 2014. 14ER2817–50. The magistrate judge denied Mavrix's second motion as well, because "Plaintiff did not make a good-faith effort to notify the interested, anonymous parties of the pending motion," and "the Court cannot grant the requested relief without first allowing them the opportunity to respond." 14ER2795, 2743. Mavrix moved for review of the Magistrate Judge's orders (14ER2760–61), but the district court affirmed on July 22, 2014. 1ER61–64. The court agreed "that Mavrix was required to make at least some effort to notify the third-party moderators of the hearing and give them some chance to oppose the disclosure of their identifying information," given the "First Amendment protection for anonymous speech." 1ER63.

## SUMMARY OF ARGUMENT

**I.** It is undisputed that LiveJournal meets all the threshold requirements of Section 512(c)(1)(C) and 512(i) by implementing the DMCA notice-and-takedown protocol, enforcing a policy of terminating users who are repeat

infringers, and accommodating the technical measures of copyright owners attempting to identify and protect copyrighted works.

LiveJournal is shielded from infringement liability for the specific materials at issue under Section 512(c), because Mavrix does not dispute that the materials were uploaded to LiveJournal's servers in the first instance by LiveJournal users. *Subsequent* review and public display of these materials by user-moderators does not change this fact. Nor has Mavrix offered any credible evidence that LiveJournal had "actual knowledge" that the specific materials were infringing, that LiveJournal or any of its employees solicited or "curated" these materials, or that anything about the candid celebrity photographs at issue here would have made the specific infringement objectively obvious to a reasonable observer. As the district court correctly determined, LiveJournal does not have the right or ability to control the conduct of its users—beyond the basic power to remove infringing material from its system, as required by the statute—and LiveJournal's revenue is not tied to any particular community, much less specific infringing material within a community.

II.    Mavrix has not articulated how the denial of discovery into ONTD! moderators' identities resulted in actual and substantial prejudice. In any event, Mavrix does not dispute that it never attempted to provide the anonymous ONTD! user-moderators with notice of or an opportunity to respond to its motion to

20

compel.  This requires affirmance, because the First Amendment provides a well-established right to anonymous expression on the Internet, and Mavrix has not identified a compelling need for disclosure of the user-moderators' identities that outweighs the user-moderators' right to remain anonymous.

## STANDARD OF REVIEW

"A district court's grant of summary judgment is reviewed de novo." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014).  The court must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Ibid.*  The court "may affirm a grant of summary judgment on any ground supported by the record, even one not relied upon by the district court." *Ibid.* (citation omitted).

"'Broad discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1009 n.2 (9th Cir. 2014) (quoting *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).  The trial court's factual findings are reviewed for clear error. *Stewart v. Cate*, 757 F.3d 929, 934 (9th Cir. 2014).

**ARGUMENT**

## I. Congress Created the DMCA Safe Harbors to Protect Good-Citizen Service Providers Like LiveJournal

Mavrix's attempt to radically constrain the safe harbor of Section 512(c) and shift the burden of policing copyright infringement from copyright owners to online service providers runs counter to the purpose and plain text of the statute.

Congress enacted Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act ("OCILLA"), 17 U.S.C. § 512 *et seq.*, to address "[d]ifficult and controversial questions of copyright liability in the online world." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Congress resolved these questions by facilitating cooperation between Internet service providers and copyright owners through OCILLA's notice-and-takedown procedure, which "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement— ***squarely on the owners of the copyright***." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1022 (9th Cir. 2013) (citation omitted; emphasis added); MPAA6–7.[2]

---

[2] The MPAA takes no position regarding the facts of this case (MPAA1, 3, 8, 13, 16), and submitted its brief "solely to help the Court understand why this case provides no basis for upsetting settled law" regarding the Section 512(c) safe harbor (MPAA1).

Congress recognized that "[c]opyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers … who cannot readily ascertain what material is copyrighted and what is not." *UMG Recordings*, 718 F.3d at 1022; *see* S. Rep. No. 105–190, at 48 (1998); H.R. Rep. No. 105-551, pt. 2, at 57–58 (2008). Thus, under the statute's notice-and-takedown protocol, copyright owners must first "identify ***specific infringing material*** to service providers" (*UMG Recordings*, 718 F.3d at 1022 (emphasis added)), which then puts on service providers the obligation to "expeditiously" remove or disable access to "the material that is claimed to be infringing" (17 U.S.C. § 512(c)(1)(C); *see* MPAA6–7).

In creating OCILLA, Congress intended to provide "'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'" *Ellison*, 357 F.3d at 1076 (quoting S. Rep. 105–190, at 20). Congress recognized that "'in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability.'" *UMG Recordings*, 718 F.3d at 1014. Accordingly, OCILLA creates "a series of 'safe harbors,' for certain common activities of service providers" that "limit [service providers'] liability for claims of copyright infringement." *Ellison*, 357 F.3d at 1076. These safe harbors are critical to the development of the Internet and Internet companies' ability to operate

23

responsibly and efficiently: "Congress decided that … limiting liability … would 'ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.'" *UMG Recordings*, 718 F.3d at 1014 (quoting S. Rep. No. 105–190, at 8).

The safe harbor at issue here limits a service provider's liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides" on the service provider's system or network, if the service provider:

(A)    (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B)    does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C)    upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1).

Mavrix does not dispute that LiveJournal satisfies all of the threshold requirements for application of the safe harbor, and the undisputed evidence makes clear that LiveJournal follows these requirements to the letter.

First, LiveJournal diligently complies with the notice-and-takedown protocol pursuant to Section 512(c)(1)(C). LiveJournal is committed not only to educating its users about copyright laws to prevent infringement (*see* 12ER2334–35; 8ER1461–63), but also to cooperating with copyright owners to expeditiously remove infringing content, as required by 17 U.S.C. § 512(c)(1)(C). Upon receipt of an OCILLA-compliant "takedown" notice, LiveJournal promptly disables access to the material, typically within 24 hours and no longer than three days, pursuant to its internal policy. 1ER46; 12ER2339–41. Indeed, after receiving Mavrix's complaint, and notwithstanding the lack of any DMCA notice, LiveJournal voluntarily responded as though it had received a DMCA "takedown" notice and promptly disabled the user posts at issue. 1ER47; 12ER2371–81; 8ER1434.

Mavrix also does not dispute that LiveJournal "[has] designated an agent to receive notifications of claimed infringement" whose contact information is publicly available pursuant to 17 U.S.C. § 512(c)(2). *See* 1ER51 n.6; 12ER2338–39; 8ER1432–33, 1465, 1474–77.

LiveJournal also meets the threshold conditions set forth in Section 512(i), which require that a service provider:

> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances

of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures [used by copyright owners to identify or protect copyrighted works].

17 U.S.C. § 512(i)(1), (2); *see Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007); 1ER51.

LiveJournal terminates the accounts of users who engage in repeat copyright infringement (8ER1467; 8ER1470–72; 9ER1653–54), and takes additional steps to prevent such users from returning to LiveJournal's service, including blocking their email and IP addresses. 12ER2337; 8ER1432. LiveJournal also "accommodates and does not interfere" with "standard technical measures" used by copyright owners to identify infringing material. *See* 1ER51 n.6.

In sum, LiveJournal is *precisely* the type of DMCA good citizen that Congress sought to protect with Section 512(c), because it complies in all respects with DMCA requirements and provides a free platform for millions of blogs, journals, and communities for users around the world.

## II. The Trial Court Correctly Ruled That Section 512(c) Immunizes LiveJournal from Liability for Infringing Material Stored by Users

As the trial court correctly ruled, LiveJournal meets all the requirements of Section 512(c) and is therefore entitled to the protection of the DMCA safe harbor. In particular, the infringing material at issue was uploaded by users, LiveJournal did not have actual or red-flag knowledge that these specific materials were

allegedly infringing, did not have the right or ability to control infringing activity, and did not derive a direct economic benefit from any alleged infringement.

### A. The Allegedly Infringing Photographs at Issue Here Were Stored on LiveJournal's System at the Direction of Users

By its plain terms, Section 512(c) applies to infringing materials residing on a service provider's system "at the direction of the user." Here, "[i]t is undisputed that third-party users selected the content for the seven posts in question, created the posts, and uploaded the posts to LiveJournal's service." 1ER52; *accord* AOB3, 33, 39. It matters not that *user*-moderators (not LiveJournal) then screened and approved for display those posts that conformed to *ONTD!*'s (not LiveJournal's) guidelines and were not obviously infringing (*see* AOB34–35, 40), because the materials that moderators reviewed—regardless of whether they were approved— were uploaded to LiveJournal's system *by users*. *See, e.g.*, *CoStar Grp., Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 701–02 (D. Md. 2001); *cf. CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004).

### 1. LiveJournal prohibits copyright infringement and does not create or implement community guidelines

Mavrix claims that LiveJournal "instructs" users to upload infringing content "by way of a rule" requiring users to upload only copyrighted material, and that the infringing material was therefore stored at the direction of LiveJournal rather than users. AOB3, 34. This is demonstrably false, misstates both the nature and

content of the user-generated "rules" that govern the ONTD! community, and ignores the distinction between LiveJournal and its users.

As even Mavrix recognizes, the distinction between an online service provider and its users is the "litmus test" for Section 512(c)'s safe harbor. AOB35. OCILLA *assumes* that service providers like LiveJournal "control[] or operate[]" the systems on which infringing material is stored, but shields providers from liability where the infringing material is "stor[ed] … at the direction of a user." 17 U.S.C. § 512(c)(1).

Far from "instruct[ing]" users to engage in copyright infringement, LiveJournal actively corrects users' misconceptions about copyright infringement in an effort to *reduce* infringement on its system. *See*, *e.g.*, 4ER600–01, 659. For instance, LiveJournal's Terms of Service expressly state that users agree "NOT [to] use the Service to … [u]pload, post or otherwise transmit any Content that infringes any … copyright or other proprietary right." 12ER2334; 8ER1431, 1461–63; *see* MPAA13 (explaining that Section 512(c) shields service providers that do not apply rules "for the purpose of adding, rather than removing, content … owned by third parties"). LiveJournal enforces these terms by removing infringing content through the DMCA notice-and-takedown process and by banning repeat infringers. *See supra* pp. 25–26. LiveJournal imposes no other special "rules" or "instruct[ions]" on any community, including ONTD!

28

The "rules" to which Mavrix refers are guidelines that members of the ONTD! community created for their own users. LiveJournal communities are organized by users, and users within those communities have the option to—and often do—institute their own guidelines for posting and commenting in the community. *See* 1ER45–46; 12ER2348–49. ONTD! is no exception; the guidelines governing ONTD! were created by regular ONTD! users—*not LiveJournal*—and they were created long before Mr. Delzer became an employee or began participating in the ONTD! community. 1ER58; 8ER1483; 12ER2349. LiveJournal merely provides the platform on which ONTD! and millions of other communities operate, and it has no role in ONTD! users' decisions to enforce—or not to enforce—their own community guidelines. 1ER52, 60; 12ER2365; *see infra* pp. 32–33, 57–58.

Mavrix also misrepresents the content of these guidelines, suggesting they *require* the posting of content "owned by third parties." AOB34, 37, 58. In fact, the relevant ONTD! guidelines neither support nor encourage infringement. The guidelines simply state, "Don't be lazy with your posts. Include the article and picture(s) in your post ... do not simply refer us off to another site for the goods," and "You must provide a source" with a "full and direct" URL. 1ER57–58; 7ER1115–17. None of these guidelines suggests that ONTD! will accept only infringing material. The guidelines were intended to discourage users from "just

[posting] a URL" rather than "a starting off point for the post for people to comment on" (1ER57–58; 7ER1180), and to enable users and moderators to judge the accuracy of posted content (such as celebrity news or gossip) and to screen out obviously infringing content from proprietary websites (7ER1202–07; 8ER1484–85; 12ER2349–51).

Moreover, nothing about requiring a source encourages infringement, because a "source" could be virtually anything, including ONTD! users' own content and materials not subject to copyright protection. *See* 8ER1484, 1545–85. In fact, users upload scores of non-infringing material—*e.g.*, original commentary, user photos, and embedded (*i.e.*, linked) videos—to ONTD! on a daily basis. 1ER57–58; 8ER1484, 1545–85; 12ER2346. Strangely, Mavrix actually *faults* ONTD! moderators for removing infringing content and educating a user that "putting [a source] at the end does not let you steal an entire multipage article and all the images." AOB55 (quoting 16ER3435).

Simply put, neither LiveJournal nor ONTD! invites copyright infringement.

### 2. The infringing materials were uploaded to LiveJournal's system by users

Mavrix next suggests that LiveJournal "curates" copyrighted material by "sifting" user-uploaded photographs for infringing content. AOB 34–35, 40. Once again, Mavrix ignores the distinction between LiveJournal and its users.

The district court noted that "[i]t is undisputed that *third-party users* selected the content for the seven posts in question, created the posts, and uploaded the posts to LiveJournal's service" in the first instance for review by ONTD! moderators. 1ER52 (emphasis added); *see* AOB3, 33, 39. No one, other than the user that uploaded the post, could "edit" those posts once they were uploaded to the queue. 1ER45; 12ER2359. Regardless of whether user-uploaded content was approved by moderators for display in the ONTD! community, the content was "store[d]" on LiveJournal's "system or network"—in the queue—"at the direction of the user." 1ER52.[3]

Mavrix's insistence that *LiveJournal* "curates" posts for copyrighted material finds no support in the record. There is certainly no evidence of LiveJournal "solicit[ing] any specific infringing material" or "inducing its users to commit copyright infringement," let alone requesting the specific photographs at issue. 1ER56; *see UMG Recordings*, 718 F.3d at 1020; MPAA10–11. Nor did LiveJournal decide whether to reject or approve the user-uploaded content for public display in the ONTD! community. These decisions were made by ONTD!

---

[3] Even if LiveJournal were involved in the screening of the infringing material at issue—it was not—LiveJournal would *still* be covered by the safe harbor. The broad language of Section 512(c) encompasses online service providers that interact with "user-submitted" content in ways that go *beyond* "so-called 'conduit-only' functions." *Io Grp., Inc. v. Veoh Networks, Inc*., 586 F. Supp. 2d 1132, 1147 (N.D. Cal. 2008).

moderators who are simply *users* in the ONTD! community. 1ER44–45, 51–52; 8ER1483; 12ER2345.

Mr. Delzer is a moderator who LiveJournal decided to employ, but as the district court held, there is no evidence linking Mr. Delzer to the infringing posts at issue. 1ER47, 56, 57 n.12. Mavrix has never suggested that Mr. Delzer personally uploaded the infringing photographs. Nor did he *ask* anyone to upload them. "To the best of his recollection," he was "not the moderator who *approved* the posts." 1ER47 (emphasis added). Simply put, there is no credible evidence that Mr. Delzer had any involvement in the selection, upload, or review of the posts at issue. 1ER47 n.5.

Mavrix argues that the Section 512(c) safe harbor applies only to service providers who function as "electronic storage lockers" or facilitate strictly "automated access-facilitating functions" (AOB33, 36), and therefore does not apply to service providers that engage in any form of manual screening. But as the amicus MPAA properly recognizes, "settled law" on the scope of Section 512(c) actually draws the line between service providers that review posts "to prevent the uploading of copyrighted content or some *other legitimate purpose*" and those that "curate" with "the intent to solicit and feature premium, likely copyrighted, third-party content." MPAA10 (emphasis added); *accord UMG Recordings*, 718 F.3d at 1016 ("the [safe harbor] … cover[s] more than mere electronic storage lockers").

32

Indeed, courts have rejected the argument that a service provider loses the protection of Section 512(c) simply because it allows for or engages in some form of review, moderating, or screening of content that has *already been uploaded* by users. *See*, *e.g.*, *Veoh Networks*, 586 F. Supp. 2d 1140, 1146–48, 1155 (applying Section 512(c) even where defendant's "employees … 'spot check' videos after publication for compliance with [defendant's] policies" and manually "edited the video description field"); *CoStar Grp.*, *Inc. v. Loopnet*, *Inc.*, 164 F. Supp. 2d 688, 701–02 (D. Md. 2001) (applying the safe harbor even though defendant's employees conducted a "gateway" review of submitted photos and published only those that met the defendant's content criteria); *cf. CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004) (declining to find service provider liable for infringement even where the defendant's employees reviewed all uploaded photos "to block photographs that do not depict commercial real estate," because such conduct "does not … add volition to [defendant]'s involvement in storing" infringing material).[4]

As these cases emphasize, the Section 512(c) safe harbor applies to infringing material that resides on a service provider's system or network "at the

---

[4] Mavrix *concedes* that other "legitimate purposes" of screening include removing illegal and pornographic content, as conducted by service providers like YouTube (AOB10) and Veoh (AOB34), yet offers no explanation why a service provider cannot screen (or allow users to screen) infringing, inappropriate, or irrelevant content.

volition of the user" because the material was uploaded "in the first instance" by the user, regardless of whether a service provider or user *subsequently* reviews the user-uploaded material. *Veoh Networks*, 586 F. Supp. 2d at 1147–48; *Costar*, 164 F. Supp. 2d at 701–02; *cf. CoStar*, 373 F.3d at 556.[5]  The relevant, and undisputed, fact here is that *users* cause material to be "uploaded to LiveJournal's website" in the first instance.  AOB3; *accord* AOB7, 33, 39, 53.  Once submitted by a user, this material is "automatically uploaded onto LiveJournal's **servers** and placed in a queue" (1ER45 (emphasis added); 8ER1483; 12ER2354)—a fact that Mavrix has never disputed (4ER698).  Only *thereafter* do the ONTD! community moderators screen the material that has been uploaded at the user's direction.  The Section 512(c) safe harbor applies regardless of what monitoring the ONTD! users engage in *after* the materials have been uploaded at the user's direction.

Mavrix is mistaken about the so-called "publication" requirement that it pulls out of thin air.  *See* AOB33, 35, 37, 39.  The plain language of the statute applies the safe harbor to *any* infringing material "stor[ed] at the direction of a

---

[5] Mavrix claims this standard allows a service provider to "do anything and everything it wants" with copyrighted material "so long as it first received the material from a user" (AOB38), but this is incorrect.  Providers that *request* infringing content, have actual or obvious red-flag *knowledge* that the content is infringing, and receive a financial benefit *directly attributable* to the infringement are not immune under Section 512(c).  *See*, *e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1024 (9th Cir. 2013); MPAA7–13; *see infra* pp. 50–51 (addressing the significant distinctions between *Fung* and LiveJournal).

user ... on a system or network." 17 U.S.C. § 512(c)(1). Congress elected to shield service providers from liability "for infringement … by reason of the *storage*" of infringing materials on their systems—not publication to a particular group of people. If Congress had intended to limit the safe harbor to the "display" or "publication" rather than the "storage" of infringing material, it would have explicitly said so. The Court should decline Mavrix's invitation to write a publication requirement into the statute.

Mavrix also contends that content on LiveJournal's "servers" is not actually on LiveJournal's "system or network" within the meaning of 17 U.S.C. § 512(c)(1), but cites no authority for this tortured proposition. Nor could it. Servers are where a service provider's "system or network" resides. *See Fung*, 710 F.3d at 1024 ("sharing content ***over a network*** is [traditionally done through] …. one or more central computers (called '***servers***') …. Websites [operate on this] model, with the ***server storing the website's content*** and delivering it to users upon demand.") (emphases added). Thus, the content uploaded to LiveJournal's "server" was uploaded to LiveJournal's "system or network" for purposes of Section 512(c)(1). *See Fung*, 710 F.3d at 1025; *Ellison*, 357 F.3d at 1077, 1079 (equating "network" with defendant's "servers").

Mavrix criticizes LiveJournal for its communities' monitoring of content posted to the community forums, but monitoring is *required* for service providers

35

to fulfill their responsibility to terminate users "who are repeat infringers" under Section 512(i)(1)(A). *See In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658–59 (N.D. Ill. 2002) (service provider ineligible for immunity under Section 512(c) where its own encryption software prevented it from monitoring users' file transfer activity to *identify* repeat infringers). Punishing service providers that engage in monitoring would frustrate their ability to comply with Section 512(i) and render the entire safe harbor structure self-contradictory.

Mavrix's position is also at odds with legislative history, which clarifies that Congress did not intend to preclude service providers from screening or allowing users to screen uploaded content for inappropriate, irrelevant, or infringing material. Although Congress chose not to *require* a service provider to actively "monitor[] its service" or "affirmatively seek[] facts indicating infringing activity" to qualify for the safe harbors (17 U.S.C. § 512(m)), it certainly did not intend to *punish* those that engage in this activity by excluding them from the safe harbor. *See* 4-12B Nimmer on Copyright § 12B.09 (2009) ("a service provider may voluntarily elect to monitor, or to undertake conduct designed to protect copyrights").

The House Committee Report specifically cautioned that the DMCA was "not intended to discourage the service provider from monitoring its service for infringing material" and that "[c]ourts should not conclude that the service

provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program." House Conf. Rep. 105-796 at 73 (Oct. 8, 1998). Mavrix's reading of Section 512(c) would do precisely what Congress warned against—discourage any effort to screen out irrelevant, infringing, or offensive content. *Cf.* H.R. Rep. No. 105-551, pt. 2, at 58 (encouraging the development of mechanisms for "filtering out irrelevant and offensive material," which require "human judgment and editorial discretion").

### 3. LiveJournal does not have an agency relationship with third-party users and moderators

Mavrix also argues that third-party users and moderators are LiveJournal's "agents," and therefore that any actions or knowledge of ONTD! users can be imputed to LiveJournal. This is incorrect.

As a threshold matter, "agency analysis" under the Restatement of Agency is not the standard prescribed by OCILLA. "Service provider"—as relevant here—is defined as a "provider of online services or network access" (17 U.S.C. § 512(k)(1)), and none of the statutory definitions includes anything resembling "user-agents." Rather, the statute draws a categorical distinction between "service provider" and "user," exempting service providers from liability stemming from infringing material uploaded by users.

The test for determining whether a "service provider" is liable for "user" infringement under Section 512(c) is prescribed by the statute itself: (1) "actual

knowledge" or "awareness" of the specific infringement; (2) "financial benefit directly attributable to the infringing activity"; *and* (3) "the right and ability to control such activity." 17 U.S.C. § 512(c)(1).

Mavrix and amicus curiae BWP Media USA, Inc. ("BWP") rely on an unpublished district court opinion to suggest that common-law principles of agency should determine whether the conduct of "user-moderators" should be ascribed to a service provider. AOB40–41 (citing *Columbia Pictures Indus., Inc. v. Fung*, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009)); Br. of BWP 9–11 (same). But the cited analysis addresses a defendant's liability for "inducement" of copyright infringement under the Copyright Act—not the definition of "user" under Section 512(c). *Fung*, 2009 WL 6355911 at *13. In that case it was *undisputed* that the moderators acted as the defendants' authorized agents and could speak on defendants' behalf. *Ibid.* The defendants were ineligible for the safe harbor because they had "actual knowledge" of user infringement and at least one defendant *personally* engaged in infringing activities. *Id.* at *16–18. *Fung* is therefore inapposite.

Even under common-law principles of agency, were they to apply, the district court correctly determined that ONTD! moderators "are independent third-party users, not agents of LiveJournal." 1ER57 n.12; 1ER52 n.7. ONTD! moderators are *users* of LiveJournal's service who voluntarily choose to participate

38

in a community that appeals to their interests. 1ER45. They have none of the hallmark attributes of "agents."

LiveJournal certainly does not convey "assent that [third-party moderators] take action on [LiveJournal]'s behalf," as Mavrix claims. AOB41 (quoting Restatement (Third) of Agency, § 3.01 (2006)); *see also Malloy v. Fong*, 37 Cal. 2d 356, 373 (1951) (requiring principal to give "consent" to an agent). The third-party ONTD! moderators are appointed by the existing user-moderators and user-maintainers within a community. 8ER1482, 1522–31; 9ER1608; 12ER2353–54. Nor are moderators subject to LiveJournal's "supervision and control." AOB41–42 (quoting *Fong*, 37 Cal. 2d at 373–74). Whether, when, where, and how moderators participate (if at all) in the ONTD! community is determined by the moderators themselves. They have no schedule. 12ER2355. They receive no training or supervision. 12ER2356, 2364–65; 8ER1429–30. Mavrix underscores that third-party "moderators' work is even performed with a livejournal.com email address" (AOB42), but *every user* with a paid account is given a livejournal.com email address, just as registered users of Yahoo! and Google have yahoo.com and gmail.com addresses.

Put simply, the ability for users to moderate communities is a choice offered to every community on LiveJournal's system. LiveJournal does not direct or control these community-based, user-driven decisions. 1ER56. Mavrix's

argument that LiveJournal has unintentionally granted potentially *millions* of users who voluntarily moderate their own communities the authority to act as "agents" of LiveJournal is simply beyond the pale.

The only ONTD! moderator with whom LiveJournal has any direct relationship is Brenden Delzer. But Mr. Delzer did not upload or ask anyone to upload any of the infringing photographs at issue, nor does he recall reviewing or approving these materials. *See supra* pp. 13, 32; 1ER47; 8ER1485; 12ER2367–69.

Mavrix claims Mr. Delzer is the "master" of the ONTD! moderators, and that they are effectively his agents. AOB42–43. But this is incorrect for all of the reasons discussed above. The third-party moderators are volunteers who receive no training, have no set schedule, can review where and when they please (if at all), are appointed by group consensus of the ONTD! moderators and maintainers, and enforce the guidelines established by the community. 8ER1429–30, 1482, 1522–31; 12ER2353–55, 2364–65. Mr. Delzer was a long-time volunteer moderator and maintainer of the ONTD! community *before* he was hired by LiveJournal in 2010, and he continues to act as a moderator and maintainer in the same way he did before his hire. 8ER1483; 12ER2349.

Mavrix cites several conversations between Mr. Delzer and other ONTD! moderators to suggest that he somehow directs and supervises their work (AOB42–43), but the trial court correctly concluded that this evidence "hardly shows" any

40

level of control (1ER56–57). At best, Mavrix demonstrates that Mr. Delzer is actively involved in the ONTD! community, discusses community guidelines with the other moderators, and accepts and rejects posts as do all of his ONTD! moderator colleagues. *Ibid.*; *see* 1ER35–36. As the district court emphasized, "Mr. Delzer is merely one of six maintainers with the same administrative privileges for ONTD!, and merely one of eight ONTD! users with moderator powers." 1ER56.

Finally, even if ONTD! moderators were LiveJournal's agents—they are not—LiveJournal would still be covered by Section 512(c). As discussed above, "gateway" screening, even if conducted by a service provider, does not change the fact that any infringing material was uploaded "in the first instance" at the "volition of users," and therefore "resides on" the service provider's system "at the direction of a user." *Veoh Networks*, 586 F. Supp. 2d at 1146–48; *CoStar*, 164 F. Supp. 2d at 701–02; *cf. CoStar*, 373 F.3d at 556; *see supra* pp. 33–34.

## B. LiveJournal Had No Specific Knowledge of the Alleged User Infringement at Issue

Under Section 512(c)(1)(A), a service provider falls under the safe harbor if it "does not have actual knowledge that the material or an activity using the material on the system or network is infringing," or if, "upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material." This Court has underscored that a service provider must have "*specific*

41

knowledge of *particular* infringing activity" to lose the protection of Section 512(c). *UMG Recordings*, 718 F.3d at 1021 (emphases added); *accord Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012) (requiring "actual knowledge … of specific and identifiable infringements"). Mavrix has not met its burden of proving actual knowledge in this case.

Mavrix argues that the specificity requirement does not apply here. AOB51–52 (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)). But *Fonovisa* is not a DMCA case. This is significant, because Congress made a "considered policy determination" in the DMCA to "place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *UMG Recordings*, 718 F.3d at 1022; *see supra* pp. 22–23. Thus, Mavrix's complaint that LiveJournal does not license Mavrix's content is misplaced (AOB7), because it is *Mavrix's* responsibility to license and police infringement of its own copyrighted material. *Ibid.*

"[T]o detect and deal with copyright infringements" occurring in the "digital network[ing]" realm (*Ellison*, 357 F.3d at 1076), Congress created the "notice and takedown protocol encouraging copyright holders to identify specific infringing material to service providers" (*UMG Recordings*, 718 F.3d at 1022). And to underscore *copyright owners'* responsibility to identify and report infringing

content to service providers, the statute provides that a DMCA notice that fails to provide information "sufficient to permit the service provider to locate the material" (17 U.S.C. § 512(c)(3)(A)(iii)) is excluded for purposes of the knowledge inquiry (*id.* § 512(c)(3)(B)(i)), because it is not the responsibility of the service provider to affirmatively seek out infringing material. *See UMG Recordings*, 718 F.3d at 1022 ("owners of the copyright … [must] adequately document[] infringement"). The statute *explicitly* provides that safe harbors are not conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

Here, Mavrix chose to bypass the notice-and-takedown process entirely. Before filing this lawsuit, Mavrix provided no notice to LiveJournal of the specific infringement at issue, let alone notice compliant with the DMCA. 1ER47; 12ER2371–72, 2374, 2376–79, 2387–89. Although Mavrix was not *required* to provide notice, its "decision to forgo the DMCA notice protocol 'stripped it of the *most powerful evidence of a service provider's knowledge*—actual notice of infringement from the copyright holder.'" *UMG Recordings*, 718 F.3d at 1020 (citation omitted; emphasis added). Mavrix accordingly must meet the "high burden" of demonstrating *actual* knowledge. *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1107 n.11 (C.D. Cal. 2009) (quoting 3-12B

Nimmer on Copyright § 12B.04 n.41 (2009)); *accord UMG Recordings*, 718 F.3d at 1020.

Mavrix points to ONTD! guidelines asking users to include referenced material and sources with their posts, arguing these guidelines "require" users to post infringing material. AOB53–54. First of all, as discussed above, these were not LiveJournal's guidelines, but the guidelines created by LiveJournal *users*. And Mavrix's claim is belied by scores of non-infringing material uploaded to ONTD! on a daily basis, including materials not subject to copyright protection and ONTD! users' own content. 1ER57–58; 8ER1484, 1545–85; *see supra* pp. 29–30.

Mavrix also claims that Mr. Delzer must have had "actual knowledge" of the infringement, because he sees "all the uploads" on ONTD!. AOB53–54. Mr. Delzer testified, however, that he does not "approve or reject or see every post that comes through the queue," though he "probably," "[a]t some point," sees posts that "make it onto the website." 7ER1215:2–16. As to the particular photographs at issue, Mr. Delzer testified that to the best of his knowledge and recollection, he did not review or approve these posts. 1ER47 & n.5; 12ER2367–69; 8ER1485–86. Mr. Delzer stated that he views ONTD! on a daily basis, spends about "an hour and a half [per] day" reviewing posts, and is very "passion[ate]" about the ONTD! community. *See* 7ER1121, 1147:24–1148:3, 1212-15. But this does not satisfy

Mavrix's heavy burden of proving "specific knowledge" of "particular infringing activity." *UMG Recordings*, 718 F.3d at 1021.

Even if Mr. Delzer saw the photos, Mavrix has never demonstrated that Mr. Delzer (let alone *LiveJournal*) *actually knew* the photographs were allegedly infringing. As the trial court found, "[t]he images are candid photographs of celebrities in public settings, unposed, mostly taken from the back or the side without the subject looking at the camera. By all appearances, none of the celebrities consented to or even knew that their photographs were being taken." 1ER54. Without specific notice of infringement from Mavrix under the DMCA, "it would be nearly impossible for a provider to distinguish between 'professional paparazzi' photographs … and photographs taken by any member of the public with a digital camera or smartphone." 1ER54; *see Veoh Networks*, 586 F. Supp. 2d at 1148–49 (holding that even photographs that *appear* to be the work of a professional do not create notice of infringement, because "with the video equipment available to the general public today, there may be little, if any, distinction between 'professional' and amateur productions").[6]

Mavrix claims that one post included watermarks (AOB54), but those watermarks merely say "isopix" and do not indicate that the photographs are

---

[6] Mavrix claims LiveJournal waived these points below (AOB55–56), but LiveJournal argued these very issues before the district court, in detail, with citations to controlling authority. *See* 4ER652–53 & n.10.

copyrighted. *See* 5ER864–75. Another post had photographs with "mavrixonline.com" written on the bottom margin (AOB54; 5ER894–95), but an Internet address alone does not provide actual notice that material is copyrighted. *See generally* 17 U.S.C. § 401(b) (statutory "notice of copyright" must include "the symbol © (the letter C in a circle), or the word 'Copyright', or the abbreviation 'Copr.'") Moreover, there is no evidence that Mr. Delzer reviewed or approved this post, and Mr. Delzer testified that he was unaware that Mavrix had a website. 1ER57.

Relying on a "survey" conducted by its owner, Mavrix argues that "84%" of content on ONTD! is "obviously unlicensed and indeed infringing," and that LiveJournal should know that "almost every single post is stolen." AOB53–54. But this survey is inadmissible and unreliable, and cannot be used to impute knowledge of infringement to LiveJournal. Mavrix arrived at this number by reviewing posts on ONTD! from a 10-day period, and purportedly determined that "84%" of posts were taken "from other third party websites." 6ER946–48. Mavrix never investigated these posts to determine whether they included material *actually protected* by copyright; if copyrighted, whether the use was licensed; and, if not licensed, whether the use was permitted under the fair use doctrine. Mavrix's "analysis" is both unscientific and inadmissible (4ER653, 519–530), and it proves nothing about the volume of infringement in the ONTD! community.

46

Regardless, this Court in *UMG Records* squarely rejected Mavrix's argument, holding that "[m]erely hosting a category of copyrightable content," with "the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement" under Section 512(c)(1)(A). *UMG Recordings*, 718 F.3d at 1022. Indeed, the DMCA "*assumes* that 'from time to time, material belonging to someone else ends up' on service providers' websites, and establishe[d]" the notice-and-takedown procedure "for … prompt removal." *Id.* at 1024 (emphasis added). If "acknowledgment of this general problem … was enough to remove a service provider from DMCA safe harbor eligibility, the notice and takedown procedures would make little sense and the safe harbors would be effectively nullified." *Ibid.*

The Second Circuit in *YouTube* also squarely rejected Mavrix's argument because even though YouTube, like LiveJournal, knows that some of its users post infringing material, the DMCA's safe harbor applies in the absence of actual knowledge of particular infringement. Indeed, in *YouTube*, the plaintiffs provided evidence that YouTube's own employees "estimated that 75-80% of all YouTube streams contained copyrighted material." *YouTube*, 676 F.3d at 32–33. But even evidence of ubiquitous infringement is insufficient "to create a triable issue of fact as to whether YouTube *actually knew … of particular* instances of infringement." *Id.* at 33 (emphasis added). Likewise, even if Mavrix could demonstrate that

47

ONTD! users frequently engage in infringement, this does not prove that LiveJournal *actually knew* that the specific photographs *at issue* here were infringing.

In short, Mavrix chose not to provide LiveJournal with notice of infringement through DMCA's notice-and-takedown protocol, and has failed to submit any evidence that LiveJournal otherwise had knowledge of the allegedly infringing photographs.

### C. LiveJournal Had No "Red Flag" Knowledge of the Alleged User Infringement at Issue

Mavrix likewise does not identify any credible evidence that LiveJournal was "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). The mere fact that infringement occurs on LiveJournal's system—as it does on virtually every service provider's system— does not prove "red flag" knowledge of specific infringement. *UMG Recordings*, 718 F.3d at 1023; *YouTube*, 676 F.3d at 32–33. Indeed, even under the "red flag test," the "burden remains with the copyright holder" to demonstrate that the service "provider was *subjectively* aware of facts that would have made the *specific* infringement 'objectively' obvious to a reasonable person.'" *Fung*, 710 F.3d at 1043 (citation omitted; emphases added); *UMG Recordings*, 718 F.3d at 1023, 1025; *accord YouTube*, 676 F.3d at 31.

48

As addressed above, Mavrix has not demonstrated that anyone at LiveJournal even saw the specific infringing photographs at issue. Nor has Mavrix articulated facts about any of the allegedly infringing photographs that should have made it "objectively obvious" they were infringing. Candid celebrity photographs certainly do not belong to a category of *per se* copyrighted material. 1ER54; 4ER652–53; *see supra* pp. 45–46.

Mavrix also suggests that it is LiveJournal's "business model" to infringe, that its rules "require" users to upload infringing material, and that LiveJournal "bur[ies] its head in the sand" to avoid obtaining knowledge of infringement. AOB57–59. Mavrix goes so far as to compare LiveJournal to the obvious bad-actor defendants in *Fung* and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913 (2005). This comparison is completely baseless.

The defendant in *Fung* "urg[ed] his users to both upload and download *particular* copyrighted works, provid[ed] assistance to those seeking to watch copyrighted films, and help[ed] his users burn copyrighted material onto DVDs." *Fung*, 710 F.3d at 1043 (emphasis added). All of the material in question consisted of "current and well-known" music, movies, and televisions shows such that it was "objectively obvious to a reasonable person" that the material was copyrighted. *Ibid.* Fung even "personally … download[ed] infringing material" on his website.

49

*Ibid.* Thus, there was no legitimate basis for disputing that he "had 'red flag' knowledge of a broad range of infringing activity" on his website. *Ibid.*

The defendants in *Grokster*—a non-DMCA case—ran a similar operation dedicated to facilitating infringement of obviously copyrighted music and video files. Among other things, they "distributed an electronic newsletter containing links to articles promoting [their] software's ability to access popular copyrighted music," knew that "users employ[ed] their software primarily to download copyrighted files," "respond[ed] affirmatively to requests for help in locating and playing copyrighted materials," and made no effort whatsoever "to develop filtering tools or other mechanisms to diminish the infringing activity." *Grokster*, 545 U.S. at 923–24, 937–39.

In short, the defendants in *Fung* and *Grokster* maintained websites that were designed *exclusively* for copyright infringement.

LiveJournal's "business model," by contrast, is "operat[ing] an online platform" on which millions of people "can create … individual blog[s] or start a group blog based on shared interests." 1ER60; *accord* 12ER2327–29, 2409–10. The draw for ONTD! users, in particular, is a shared community for commentary and discussion of celebrity gossip and pop culture. 12ER2345–46; 8ER1481–82. Users share scores of non-infringing posts on a daily basis that can generate thousands of comments. *Ibid.* And even though some users no doubt use

LiveJournal to post infringing content, that does not distinguish LiveJournal from scores of completely legitimate—and important—social media platforms. *UMG Recordings*, 718 F.3d at 1024.[7]

Moreover, unlike the Hollywood blockbusters and platinum music albums in *Grokster* and *Fung* that were "current," "well-known," and "obvious[ly] … copyrighted" (*Fung*, 710 F.3d at 1043), the images in question are candid photographs that can be—and frequently are—taken by anyone with a camera or cell phone. *See* 1ER54; 5ER836–97. Users routinely post non-infringing photos of this nature to the ONTD! community, and nothing about the photos at issue made it "objectively obvious" that they were infringing. *See* 1ER54.

Further, unlike the defendants in *Grokster*, LiveJournal has policies and systems in place to curb infringing activity. *Grokster*, 545 U.S. at 937–39. LiveJournal's Terms of Service expressly prohibit the posting of content that infringes any copyright of a third party. 12ER2334–35; 8ER1461–63. LiveJournal educates users about copyright infringement (4ER600–01, 659); promptly responds to DMCA takedown notices from copyright holders (1ER46; 12ER2339–41); and

---

[7] Mavrix claims that LiveJournal is an "illicit trading bazaar" for passwords to "hack celebrity photos companies like Mavrix" (AOB6, 9, 59), but there is no evidence that such "trading" actually occurred on LiveJournal, much less that it impacts this case. Mavrix has never suggested—nor could it—that any of the photographs at issue were uploaded to ONTD! by users who "stole" them or otherwise acquired them with passwords obtained in a LiveJournal community.

employs an "Abuse Team" that removes infringing users from the system and takes proactive steps to prevent their return, including blocking email and IP addresses (1ER46; 12ER2337–41; 8ER1432).

Mavrix claims that LiveJournal "laughs off" copyright claims, but this misstates the record. AOB17, 54. In *every* example cited by Mavrix, ONTD! moderators *rejected* infringing content or LiveJournal's Abuse Team *disabled access to* content in response to a DMCA takedown notice. *See*, *e.g.*, 16ER3431, 3435, 3438, 3442. The so-called "laugh" that Mavrix refers to is a message from an ONTD! moderator *educating* a user that it cannot "steal an entire multipage article and all the images" simply by "putting [source] at the end." 16ER3435. And Mr. Delzer never considered changing any rule to "require less" material (AOB17)—he asked fellow ONTD! moderators to *reject* posts sourced to Huffington Post, *pursuant to Huffington Post's request*. 16ER3426–27.

Copyright infringement is simply not the purpose of LiveJournal's service, and Mavrix has offered no credible evidence that LiveJournal was "subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person.'" *Fung*, 710 F.3d at 1043 (citation omitted); *UMG Recordings*, 718 F.3d at 1023, 1025–26.

### D. LiveJournal Does Not Receive Any Financial Benefit Directly Attributable to the Infringing Activity

Under Section 512(c)(1)(B), a service provider loses the protection of the safe harbor only if two conditions are met: (1) the provider "receive[s] a financial benefit directly attributable to the infringing activity"; *and* (2) the "service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Mavrix has failed to raise a triable issue regarding either requirement.

A service provider receives a direct financial benefit from infringing activity where "there is a causal relationship between the infringing activity and any financial benefit" that the provider receives. *Ellison*, 357 F.3d at 1079. For websites that charge a subscription fee, "the relevant inquiry is 'whether the infringing activity constitutes a draw for subscribers, not just an added benefit.'" *CCBill*, 488 F.3d at 1117 (quoting *Ellison*, 357 F.3d at 1079); *see* H.R. Rep. 105–551(II), at 54 ("a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service"). For websites that receive revenue from advertising, this Court has found a direct financial benefit when the provider's "revenue stream was tied *directly* to the infringing activity." *Fung*, 710 F.3d at 1045 (emphasis added).

LiveJournal receives revenue from both subscriptions and general advertising, but neither revenue stream is tied directly to infringing activity in the ONTD! community. LiveJournal does not charge users for its basic service or any of its core features, including the ability to post, comment, or create and contribute to personal journals, blogs, or communities. Some users subscribe to paid accounts, which provide access to additional features—such as a livejournal.com email address—but none of those features bear any relationship to whether or not a user engages in infringing activity. There is simply no evidence that "customers either subscribed because of the available infringing material or cancelled subscriptions because it was no longer available." *Ellison*, 357 F.3d at 1079. Nor is any advertising revenue received by LiveJournal "tied directly" to advertising displayed in any particular journal or community, including ONTD!, much less any specific infringing activity in those journals or communities.

Mavrix relies on *Fung* (AOB49–50), but that case is inapposite. The court in *Fung* found a "financial benefit directly attributable to the infringing activity" where the service provider derived its revenue *exclusively* from advertising on a website dedicated to infringement. *Fung*, 710 F.3d at 1045. The revenue stream of the defendant—an operator of two peer-to-peer file sharing websites who "actively induced infringing activity" and "personally used the … website to download infringing material"—was "tied directly to the infringing activity." *Id.*

at 1043, 1045. The defendant in *Fung* "marketed" and "promoted" his sites to advertisers "by *pointing to infringing activity*" and by providing lists of copyrighted movies and TV shows most frequently searched for by users of the site. *Id.* at 1045 (emphasis added). He also "attracted primarily visitors who were seeking to engage in infringing activity" and "encouraged" infringement by, among other things, "responding affirmatively to requests for help in locating and playing copyrighted materials," "requesting that users upload torrents for *specific copyrighted films*," and posting "links to torrent files for copyrighted movies, *urging users to download them.*" *Id.* at 1036, 1045 (emphases added).

LiveJournal and the ONTD! community have nothing in common with the file-sharing websites at issue in *Fung*, and the revenue received by LiveJournal from advertising displayed in ONTD! is not "tied directly" to the six allegedly infringing posts at issue in this case, or to any infringing activity on the part of LiveJournal's users. As previously addressed (*see supra* pp. 8, 10), ONTD! has become a popular community over its decade-long existence, because it serves as a unique platform for user commentary and discussion. User comments—not the content of any particular post, either infringing or non-infringing—are what "draw" individuals to ONTD! (*see* 12ER2345, 2390–95, 2424), and are where the value of ONTD! lies. *See CCBill*, 488 F.3d at 766–67.

### E. LiveJournal Lacks the Right or Ability to Control the Infringing Activity

LiveJournal likewise lacks the "right and ability to control" user infringement. 17 U.S.C. § 512(c)(1)(B). Because the statute *presumes* that service providers can "'remove[] or disable access to' infringing material when they become aware of it," the right or ability to control factor requires "something more." *UMG Recordings*, 718 F.3d at 1030. At a minimum, "the service provider must 'exert substantial influence on the activities of users,'" which may include "high levels of control over activities of users," or "it may include purposeful conduct, as in *Grokster*." *Ibid.*

Mavrix asserts that LiveJournal has "complete control" over all content posted in the ONTD! community, because "LiveJournal provides detailed rules" about the "appearance" and "exact type of content" allowed on ONTD!. AOB45–47 (citing *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002)); *see* MPAA14–15. But that is factually wrong, and *Cybernet* is inapposite.

The service provider in *Cybernet* dictated specific details about the "layout, appearance, and *content*" of hosted sites; actively "*policed*" sites to enforce conformity; "monitor[ed] images" to control the saturation of certain types of photographs; and "forb[ade] certain *types of images*" not in line with themes

dictated by the provider itself. *Cybernet*, 213 F. Supp. 2d at 1173 (emphases added).

Here, *users*—not LiveJournal—decide any theming, internal practices, or content restrictions for their communities. The "rules" to which Mavrix refers are *user*-generated guidelines created by ONTD! community members, and those guidelines apply only to ONTD!—not the millions of other independent journals and communities hosted by LiveJournal. *See supra* pp. 29–30. LiveJournal dictates *nothing* to ONTD! about the "type" or "appearance" of content posted to the ONTD! community (AOB46), aside from the limitations imposed by the Terms of Service, which expressly prohibit copyright infringement. 1ER46 & n.3; 12ER2334–35. In short, ONTD!—like all other LiveJournal communities—is the creation of individual users, and LiveJournal does not direct, much less "substantially influence," users' activities. *UMG Recordings*, 718 F.3d at 1030.

Nor does the fact that the ONTD! community is moderated—or that one of its nine moderators is now an employee of LiveJournal—give LiveJournal the requisite "high levels of control" over the activities of its users. *UMG Recordings*, 718 F.3d at 1030; 1ER57 ("[Mr. Delzer's involvement] hardly shows the level of control that could exert 'substantial influence' over … LiveJournal's users"). No moderator has the ability to edit or modify the content of a post uploaded by

another user. 1ER45; 12ER2331.[8]  Additionally, a moderator's decision to accept (or reject) a post is not controlled or overseen—or even reviewable—by anyone else, including LiveJournal. 12ER2336.  As the district court concluded, ONTD!'s operation and guidelines are a "far cry from the type of intentional inducement that has been found to disqualify a service provider" from the safe harbor.  1ER58.

Mavrix cites a string of cases (AOB49) for the unremarkable proposition that a defendant may be *vicariously liable* for copyright infringement where it had the right and ability to supervise infringing activity, but none of these cases involves the DMCA, much less defines the "right or ability to control" infringement within the meaning of Section 512(c)(1)(B).

In sum, LiveJournal does not exercise "substantial influence" over content uploaded to ONTD! by individuals who are simply *users* of LiveJournal's service. And although Mr. Delzer is now an employee of LiveJournal, he exercises the same authority and fulfills the same responsibilities as any other moderator in the ONTD! community.  *See supra* pp. 13, 40–41.  The undisputed facts make clear that LiveJournal satisfies the requirements of 17 U.S.C. § 512(c)(1)(B).

---

[8] Mavrix suggests that posts *can* be edited by moderators, but cites conversations between ONTD! moderators discussing ways to edit *descriptive "tags"* for videos included in users' posts (*i.e.*, metadata), not the posts themselves. 16ER3198.

**III.   The District Court Acted Within Its Discretion in Denying Mavrix's Request to Unmask the Identities of Anonymous, Third-Party Users**

If this Court affirms the district court's ruling that LiveJournal is entitled to the DMCA safe harbor, the Court need not address the discovery issues raised in Mavrix's brief.  Mavrix has never articulated why it needs the identities of third-party user-moderators or how this information would bear on the DMCA safe harbor analysis, much less demonstrated that the district court's "denial of discovery result[ed] in *actual* and *substantial* prejudice."  *Arizona v. City of Tucson*, 761 F.3d 1005, 1009 n.2 (9th Cir. 2014) (emphases added).

Even if the Court reaches this issue, the district court acted well within its discretion in denying Mavrix's motions to compel LiveJournal to reveal anonymous users' identities, because Mavrix failed to provide notice of its motion to the users and because the users' right to anonymity under the First Amendment outweighs any speculative justification Mavrix might have for obtaining their identities.

**A.   Mavrix Failed to Provide Notice of Its Motion to Compel to the Anonymous LiveJournal Users**

Because discovery requests seeking to unmask the identities of non-party, anonymous Internet users implicate the First Amendment's long-established protection of anonymous speech (*see In re Anonymous Online Speakers*, 661 F.3d 1168, 1172–73 (9th Cir. 2011)), courts require the requesting party to "undertake

reasonable efforts to give the [anonymous user] adequate notice of the attempt to discover his or her identity and provide a reasonable opportunity to respond." *SaleHoo Grp., Ltd. v. ABC Co.*, 722 F. Supp. 2d 1210, 1214–15 (W.D. Wash. 2010). This notice requirement "enjoys general acceptance" among state and federal courts. *Ibid.*; *see, e.g., Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 456 (Md. 2009); *Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1171 (2008); *Doe v. Cahill*, 884 A.2d 451, 461 (Del. 2005); *see also Arista Records v. Doe 3*, 604 F.3d 110, 113 (2d Cir. 2010).

Mavrix does not dispute that it failed to provide notice of its second motion to compel. AOB26–28; 1ER63. Although Mavrix contacted the anonymous users in May 2014, it never mentioned its motion. Instead, Mavrix misrepresented to the users that LiveJournal had taken the "legal position" that the users were "alone responsible" for infringing Mavrix's copyrights, and advised the users to "contact [Mavrix's counsel] immediately" to protect their rights. 1ER63; 5ER935. Mavrix never again attempted to contact the anonymous users (1ER62), and it was for this reason that the court below denied Mavrix's motions to compel discovery.

Mavrix argues that the notice requirement is "radical" and unnecessary. AOB26–27. Courts have widely concluded otherwise. *SaleHoo*, 722 F. Supp. 2d at 1214–15 (collecting cases). Given the important First Amendment and privacy rights at issue, "reasonable efforts" must be made to provide anonymous users with

notice and an opportunity to respond, because anonymity "once lost cannot be recovered." *Id.* at 1215. Mavrix also claims that it could not contact the anonymous user-moderators without their identities (AOB26–27), yet it admits to independently contacting them through the LiveJournal system. 5ER820–21. Even if Mavrix lacked the ability to contact the anonymous users, it could have asked the district court or LiveJournal for assistance in this effort. *See*, *e.g.*, *Arista Records*, 604 F.3d at 113; *SaleHoo*, 722 F. Supp. 2d at 1215. Mavrix elected to sit on its hands. 1ER63.

Alternatively, Mavrix claims the anonymous users' activity falls outside the protection of the First Amendment. AOB22–25. But moderators participate in the ONTD! community by posting, commenting, and contributing to group discussion—all of which is speech falling squarely under the protection of the First Amendment. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997). These diverse activities likewise cannot be characterized as "commercial speech"—*i.e.*, "expression related *solely* to the economic interests of [the users] and [their] audience" (*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (emphasis added))—because the anonymous users have *no economic interest* in ONTD!.

61

### B. LiveJournal Users' Rights to Privacy and Anonymity Outweigh Any Interest in Unmasking Their Identities

The district court did not rule on the merits of LiveJournal's First Amendment argument, and resolution of this issue is unnecessary on appeal. But even if this Court addresses the issue, it should sustain LiveJournal's defense because Mavrix cannot articulate a need to unmask the identities of the ONTD! user-moderators that outweighs their constitutional right to anonymous expression.

The individuals Mavrix seeks to unmask are ordinary LiveJournal users who have a First Amendment right to "remain anonymous" online. *Anonymous Online Speakers*, 661 F.3d at 1174. "[T]he ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation … [or] concern about social ostracism.'" *Id.* at 1173 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995)).

When a party "seeks the identity of an anonymous Internet user who is not a party to the underlying litigation," courts have applied a more exacting standard that requires a *prima facie* showing of the plaintiff's claim before unmasking the user's identity. *Anonymous Online Speakers*, 661 F.3d at 1176. Courts in this Circuit frequently apply a two-pronged balancing test requiring (1) the plaintiff to "adduce *competent evidence* … supporting a finding of *each* fact that is essential to a given cause of action," and (2) the court to "compare the magnitude of the harms

62

that would be caused to the competing interests by a ruling in favor of the plaintiff and by a ruling in favor of the defendant." *Highfields Capital Mgmt. L.P. v. Doe*, 385 F. Supp. 2d 969, 975–76 (N.D. Cal. 2005) (emphases added).

Mavrix falls far short of satisfying even the initial prong, because it has not "adduce[ed] competent evidence" demonstrating that LiveJournal is not shielded from liability for user infringement under Section 512(c). *Highfields*, 385 F. Supp. 2d at 975–76; *see supra* Section II; 1ER60. Even if Mavrix had satisfied its initial evidentiary burden, the balance of harms weighs heavily against disclosure because Mavrix has never articulated a need for the users' *identities*. Mavrix's agency argument, for example, turns entirely on Mr. Delzer's relationship to LiveJournal, and Mavrix already deposed Mr. Delzer. *See* 7ER1126–1217. Mavrix also obtained substantial discovery concerning LiveJournal and its relationship to ONTD! and the community's moderators. *See*, *e.g.*, 2ER77. Mavrix cannot identify any "harm … to [its] interests" (*Highfields Capital*, 385 F. Supp. 2d at 980–81), because it was fully able to press its arguments against the application of Section 512(c) without revealing these users' identities.

By contrast, LiveJournal and its users would suffer long-term harm from an order destroying the anonymity of ONTD!'s user-moderators. Many users would not participate in LiveJournal's communities if they could not do so anonymously. *See Anonymous Online Speakers*, 661 F.3d at 1174; *Art of Living Found. v. Does*

*1-10*, 2011 WL 5444622, at *9 (N.D. Cal. Nov. 9, 2011). Stripping these users of their anonymity would also have a "chilling effect" on the speech of potentially millions of other LiveJournal users. *See Anonymous Online Speakers*, 661 F.3d at 1174; *Cahill*, 884 A.2d at 460, 462. Simply put, the "magnitude of the harms" to ONTD! users in revealing their identities outweighs any speculative need Mavrix has for this information.[9]

## CONCLUSION

For the foregoing reasons, LiveJournal respectfully requests that this Court affirm the judgment.

Dated: June 15, 2015

Respectfully submitted,

 /s/ Wayne M. Barsky

Wayne M. Barsky
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, California 90067-3026
Telephone: (310) 552-8500
wbarsky@gibsondunn.com

---

[9] LiveJournal has never conceded that anonymous users' identities are discoverable through a Section 512 subpoena, as Mavrix claims. AOB24. Instead, LiveJournal argued that if Mavrix had provided *actual notice* of infringement (free from any possible objection) by following "the DMCA's procedures in the first place," Mavrix could have sought *streamlined discovery* under Section 512(h). 3ER245. LiveJournal never suggested that it would not have raised First Amendment objections, as it had the right to do. *See In re Subpoena Issued Pursuant to the Digital Millennium Copyright Act to: 43SB.COM*, 2007 WL 4335441 (D. Idaho Dec. 7, 2007).

Blaine H. Evanson
Brandon J. Stoker
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071-1512
Telephone:  (213) 229-7000
bevanson@gibsondunn.com
bstoker@gibsondunn.com

*Attorneys for Defendant-Appellee*
*LiveJournal, Inc.*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellee LiveJournal, Inc. states that

it is not aware of any related cases pending before this Court.

Dated:  June 15, 2015

 /s/  Brandon J. Stoker
Brandon J. Stoker

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because it contains 13,891 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6), because it was prepared in a proportionally spaced font using Microsoft Word Professional Plus 2010 in 14-point Times New Roman type.

Dated: June 15, 2015

           /s/ Brandon J. Stoker
           Brandon J. Stoker

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 15, 2015.

I certify that all participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: June 15, 2015

                 /s/ Brandon J. Stoker
                  Brandon J. Stoker