Case No. 14-56596

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MAVRIX PHOTOGRAPHS LLC,

Plaintiff – Appellant,

*v.*

LIVEJOURNAL, INC.

Defendant – Appellee.

On Appeal from the U.S. District Court, Central District of California
Case No. 8:13-cv-00517-CJC-JPR

---

## BRIEF OF ONLINE SERVICE PROVIDERS
## ETSY, KICKSTARTER, PINTEREST, AND TUMBLR
## IN SUPPORT OF APPELLEE

---

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800

Sara Rowe (*Admission Pending*)
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Counsel for Amici Curiae*

CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* make the following disclosures. Etsy, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Kickstarter, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Pinterest, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Tumblr, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI* ............................................................... 2

SUMMARY OF ARGUMENT ............................................................ 5

ARGUMENT ....................................................................................... 7

I.  THE DMCA ALLOWS SERVICE PROVIDERS TO
    REVIEW CONTENT WITHOUT LOSING PROTECTION .......... 7

    A.  Service Providers Do Not Lose 512(c) Protection By
        Moderating Their Users' Submissions ................................. 7

    B.  The DMCA's Knowledge Provisions Reflect The
        Difficulties That Online Services Face In Determining
        Whether Material Is Infringing ........................................ 10

        1.  The Knowledge Provisions Are Deliberately
            Narrow ........................................................................ 11

        2.  Determining Infringement Requires
            Consideration of Complex Factual And Legal
            Questions ................................................................... 14

        3.  Determining Ownership, Authorization, And Fair
            Use Is Especially Challenging For Online
            Services ...................................................................... 17

II. MAVRIX'S APPROACH WOULD DISCOURAGE SERVICE
    PROVIDERS FROM MONITORING OR INTERACTING
    WITH USER-SUBMITTED CONTENT ...................................... 23

    A.  The DMCA Gives Providers Room To Monitor Their
        Services For Objectionable or Irrelevant Material ............. 23

    B.  The DMCA Allows Service Providers To Help Users
        Find The Most Desirable Content ..................................... 25

    C.  Proper Application Of The DMCA Protects Legitimate
        Online Expression .......................................................... 29

CONCLUSION ................................................................................. 31

CERTIFICATE OF COMPLIANCE ................................................. 32

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ....................................................... 11

*Burrow-Giles Lithographic Co. v. Sarony*,
   111 U.S. 53 (1884) .......................................................... 14

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ......................................................... 21

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011) ............................................. 20

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ................................. 13, 14

*CoStar Grp., Inc. v. LoopNet, Inc.*,
   373 F. 3d 544 (4th Cir. 2004) ......................................................... 9

*Effects Assocs. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) ......................................................... 15

*Faulkner v. Nat'l Geographic Soc'y*,
   211 F. Supp. 2d 450 (S.D.N.Y. 2002) ....................................... 14,15

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ........................................... 15

*Garcia v. Google, Inc.*, __ F.3d __, 2015 U.S. App. LEXIS
   8105 (9th Cir. May 18, 2015) (en banc) ....................................... 14

*Golan v. Holder*,
   132 S. Ct. 873 (2012) ...................................................... 14

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ......................................... 18

*Lenz v. Universal Music Corp.*,
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) .............................. 21, 22, 30

iii

*Morrill v. Smashing Pumpkins*,
   157 F. Supp. 2d 1120 (C.D. Cal. 2001) ........................................... 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ................................................. 11, 21

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ................................................. 17, 20

*Sofa Entm't, Inc. v. Dodger Prods.*,
   709 F.3d 1273 (9th Cir. 2013) ...................................................... 30

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
   718 F.3d 1006 (9th Cir. 2013) ............................................. 8, 11, 17

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ............................... 12, 15,19

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) .................................................... 8, 11, 16

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012) ........................................... 29

## STATUTES & LEGISLATIVE HISTORY

17 U.S.C. § 107 ....................................................................................... 15

17 U.S.C. § 512(c) ........................................................................... *passim*

17 U.S.C. § 512(g) ................................................................................... 13

17 U.S.C. § 512(m) .................................................................................. 9

47 U.S.C. § 230(c)(2) ............................................................................. 10

H.R. Rep 105-551 (II) (1998) .............................................................. 12

H.R. Rep. 105-796 (1998) ............................................................. 5, 6, 9

S. Rep. 105-190 (1998) .................................................................. *passim*

# MISCELLANEOUS

Andrew M. Kaikati & Jack G. Kaikati, *Stealth Marketing: How to Reach Consumers Surreptitiously*, 46 CAL. MGMT. REV. 6 (2004).................................................................. 19

Casey Fiesler, *Everything I Need To Know I Learned from Fandom: How Existing Social Norms Can Help Shape the Next Generation of User-Generated Content*, 10 VAND. J. ENT. & TECH. L. 729 (2008) ........................................ 22

Ethan Smith & Peter Lattman, *Download This: YouTube Phenom Has a Big Secret*, Wall St. J., Sept. 6, 2007, *available at* http://online.wsj.com/news/articles/SB118903788315518780 ................................................................................................ 19

Lawrence Lessig, *Free(ing) Culture for Remix*, 2004 UTAH L. REV. 961 (2004)............................................................... 22

3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 10.03[A] (1989) ...................................... 15

Philip N. Howard, et al., *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?*, Project on Information Technology and Political Islam, Sept. 11, 2011, *available at* http://pitpi.org/?p=1051.................... 27

Robert Sprague & Mary Ellen Wells, *Regulating Online Buzz Marketing: Untangling a Web of Deceit*, 47 AM. BUS. L.J. 415 (2010)............................................................... 19

*Amici curiae* Etsy, Inc., Kickstarter, Inc., Pinterest, Inc., and Tumblr, Inc. submit this brief to explain some of the serious operational and legal problems that Appellant's proposed application of the DMCA would create for online service providers.

By providing "safe harbor" from copyright liability, the DMCA offers critical protection to services providers like *amici*, who allow users to post, share, sell, and access material online. Proper interpretation of the statute is essential for these services to remain open platforms for creative, political, and cultural expression. Here, the District Court correctly ruled that the DMCA protected Appellee LiveJournal, Inc. ("LiveJournal") against claims arising from its users' uploading of photographs that Appellant Mavrix Photographs LLC ("Mavrix") claims to own. In an effort to undo that ruling, Mavrix asks this Court to significantly limit the protection available to all online services. Under Mavrix's approach, service providers could not moderate content, attempt to screen out objectionable material, or organize the information that their users submit without putting their safe harbor at risk. This Court should reject that result, which undermines Congress's intent to foster—and certainly not to deter—responsible behavior by online services.

1

## INTEREST OF THE *AMICI*

*Amici* are leading online service providers that offer innovative ways for users to express themselves by creating and sharing content.[1]

**Etsy, Inc.** ("Etsy") is an online marketplace where millions of people around the world connect to make, sell and buy unique goods. Founded in 2005, Etsy's ecosystem now includes creative entrepreneurs who sell on its platform, thoughtful consumers looking to buy unique goods, responsible manufacturers who help sellers grow their businesses, and employees who maintain Etsy's platform and nurture its community. Etsy's mission is to reimagine commerce in ways that build a more fulfilling and lasting world, and it is committed to using the power of business to strengthen communities and empower people.

**Kickstarter, Inc.** ("Kickstarter") is an independent company of about 115 people located in Brooklyn. Kickstarter provides a funding platform for creative projects—everything from films, games, and music to art, design, and technology. Kickstarter is full of ambitious, innovative, and imaginative projects that are brought to life through the direct

---

[1] *Amici* and their counsel are solely responsible for this brief. No one else helped write it or contributed money for its preparation or submission. All parties have consented to the filing of this brief.

support of others. Since its launch in 2009, 8.8 million people have pledged $1.8 billion, funding 86,000 creative projects. Thousands of creative projects are raising funds on Kickstarter right now.

**Pinterest, Inc.** ("Pinterest") is an online platform that allows people to save visual bookmarks, discover new things, and engage with the people who create them. Users save images and information about the objects in them as "Pins" from their own collections or from across the web, and organize those Pins in themed collections called boards. As users browse the millions of boards and more than 50 billion Pins available on Pinterest, they can Pin the content they find onto their own boards and follow the users and boards they find most useful, inspiring, or interesting.

**Tumblr, Inc.** ("Tumblr") provides a platform for users to share their artwork, writing, photos, audio, and video with a worldwide audience. Tumblr is home to over 240 million blogs and over 113 billion posts. The platform allows users to connect with others who share their interests, to explore new ideas and creative expressions, and form communities spanning culture, age, and geography.

3

In operating their services, *amici* rely on the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. *Amici* are the kinds of services for which the DMCA was designed. They provide open online platforms where users can store, share, sell, and allow others to view content of their choosing. Each minute of every day, millions of users around the world post material of every variety—text, photographs, audio, and video—to *amici's* services and use those services to access items that others have posted. This material allows users to express who they are, what they care about, and what's happening in their lives. By making this information available, online services like *amici* have become essential sources of breaking news, political debate, and artistic expression.

The DMCA gives this exchange of information and ideas the legal protection it needs. It does so by ensuring that legitimate service providers will not as a matter of course face copyright infringement claims based on material that their users store and share. By balancing the interests of online services, copyright owners, and the public, the DMCA safe harbors have helped preserve copyright protection in the Internet age while allowing services like *amici* to flourish. *Amici* have a compel-

ling interest in seeing that the DMCA is properly applied, taking account both Congress's intent and the practical realities that online services face in interacting with user-submitted content.

## SUMMARY OF ARGUMENT

In enacting the DMCA, Congress recognized that online service providers have compelling reasons for reviewing or organizing material on their services. Responsible providers often try to limit the availability of content that may be illegal or offensive—including obscenity, hate speech, and graphic violence—or that simply does not fit with the mission of their service. Interacting with user-submitted material also allows desired content to find its way to the appropriate place where it may be found among the huge repositories of information that live online. By sorting through users' posts, service providers can help users locate and identify what is most relevant and interesting to them.

While Congress intended the DMCA to make room for these voluntary forms of content review, Mavrix seeks to undermine it. Mavrix's efforts are misguided and, if adopted, would have pernicious consequences for online services and their users. For example, Mavrix argues that user-submitted material that is moderated by a service provider is

not stored "at the direction of a user." Beyond having no basis in the text of the statute, this flagrantly disregards Congress's instruction that the DMCA was "not intended to discourage the service provider from monitoring its service." H.R. Rep. 105-796, at 73 (1998).

Mavrix's arguments about knowledge of infringement are similarly misguided. As this and other courts have repeatedly held, the DMCA's knowledge provisions are deliberately narrow. They reflect Congress's decision to assign the primary responsibility of policing infringement to copyright owners. Congress understood that identifying copyright infringement is challenging for online services and that copyright owners are far better able to determine whether their copyrights are being violated. With this in mind, the DMCA ensures that service providers don't have to play detective or make judgment calls about infringement. Under this regime, if there's legitimate uncertainty about whether something is infringing, there is no disqualifying knowledge.

Mavrix seeks to replace the robust protection that Congress envisioned with a new approach, which would allow knowledge of infringement to be inferred where the service reviews user-submitted material while being generally aware that some of that content may be infring-

ing. That would confront providers with a perilous choice. They either must refrain from interacting with user-submitted content or must block any postings that raise even a remote possibility of being infringing. Both options are fundamentally at odds with the DMCA. The first would leave online services toothless against even the worst kind of anti-social material, while making it more difficult for users to find useful content. The second would punish innocent users, silence a host of lawful speech, and erode the open nature of the Internet.

The safe harbors were intended to resolve these dilemmas, not exacerbate them. And the statute has worked. As the experiences of *amici* show, the DMCA has helped make online services vital platforms for free expression, creativity, and commerce. Mavrix seeks to undo those benefits and undermine the balance that Congress struck. The District Court rightly rejected that effort, and its ruling should be affirmed.

## ARGUMENT

## I.  THE DMCA ALLOWS SERVICE PROVIDERS TO REVIEW CONTENT WITHOUT LOSING PROTECTION

### A.  Service Providers Do Not Lose 512(c) Protection By Moderating Their Users' Submissions

Mavrix's first argument about the DMCA is that by reviewing and approving user submissions before allowing them to be posted on its

service, LiveJournal is not engaged in "storage at the direction of a user" and thus is not entitled to protection under Section 512(c). Appellant's Opening Br. at 31-40, 44. This argument is totally unsupported by the case law or the statute, and it must be rejected.

In *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013), this Court held that Section 512(c) sweeps beyond the mere storage of content to cover "accessibility-facilitating functions" performed by service providers. *Id.* at 1018-19; *see also Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 40 (2d Cir. 2012) (safe harbor applies to functions that help "users locate and gain access to material stored at the direction of other users"). These rulings recognize that providers have considerable leeway to interact with material submitted by their users. Content moderation and organization of the sort at issue here similarly fits within the 512(c) safe harbor.

The purpose of Section 512(c) is to protect service providers from copyright claims that arise regarding material stored on their systems "at the direction of a user." S. Rep. 105-190, at 43 (1998). So long as the content originates with users, and is stored in response to their requests, the 512(c) safe harbor is open. Whether a service provider mod-

8

erates or organizes user-submitted content is beside the point. As both a textual and a practical matter, an item that a user asks to be posted is no less stored "at the direction of" that user merely because the provider reviews it first. Such review does not transform content originating with the user into content originating with the service provider. *Cf. CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F. 3d 544, 555-56 (4th Cir. 2004) (service provider does not become responsible for user-submitted content by reviewing it prior to its being uploaded). Either way, the material is on the provider's system because the user has submitted it for posting, which is all that Section 512(c) requires.

The legislative history removes any doubt. While service providers have no *obligation* to monitor user-submitted content for infringement (17 U.S.C. § 512(m)), the DMCA's Conference Report explains the statute was "not intended to discourage the service provider from monitoring its service." H.R. Rep. 105-796, at 73 (1998). Mavrix's argument undermines this expectation. If the 512(c) safe harbor is categorically unavailable to any service that review user submissions, there would be a profound disincentive to service providers doing such monitoring.

That Congress intended otherwise is confirmed by the Communications Decency Act ("CDA"), which was enacted shortly before the DMCA. The CDA immunizes services for their efforts to review and remove objectionable content. 47 U.S.C. § 230(c)(2) (no online service "shall be held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable"). It would make no sense to interpret the DMCA to withhold protection from services engaging in the very kind of voluntary moderation that Congress expressly endorsed.

## B. The DMCA's Knowledge Provisions Reflect The Difficulties That Online Services Face In Determining Whether Material Is Infringing

The same principles inform the proper understanding of the DCMA's knowledge provisions. These exclusions are narrow, reflecting the fact that service providers do not lose safe-harbor protection just because they have interacted with material that turns out to be infringing. Mavrix argues otherwise. It contends that generalized awareness of infringement is sufficient, and that such knowledge exists if a service

10

provider engages with unspecified material on its system that may not be authorized. Appellant's Opening Br. at 50-60. Mavrix is wrong.

### 1. The Knowledge Provisions Are Deliberately Narrow

As an initial matter, it is well settled that the DMCA requires "specific knowledge of particular infringing activity." *Shelter Capital*, 718 F.3d at 1021-22; *see also Viacom*, 676 F.3d at 32. General knowledge that infringing material may be on the service is not enough. *See Shelter Capital*, 718 F.3d at 1023 ("[defendant's] general knowledge that it hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag."); *Viacom*, 676 F.3d at 35 (providers have no duty to "seek out infringing activity based on general awareness that infringement may be occurring"). This Court should not countenance Mavrix's effort to evade this bedrock rule.[2]

---

[2] Mavrix's argument is based on non-DMCA cases that have nothing to do with online services. Appellant's Opening Br. at 51-53. Beyond ignoring the language and purpose of the statute, the core premise of this argument—that specific knowledge of infringement is not required outside the DMCA—is wrong. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (holding that a "computer system operator" can only be held liable for contributory infringement "if it 'has *actual* knowledge that *specific* infringing material is available using its system'") (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001)) (emphasis in original).

Congress also imposed a rigid standard for what can give rise to knowledge. Unless a service provider has actual (subjective) knowledge of infringement, it can be charged with knowledge only where it "turned a blind eye to 'red flags' of obvious infringement." S. Rep. 105-190, at 48; *see* 17 U.S.C. § 512(c)(1)(A)(ii) ("facts or circumstances from which infringing activity is apparent"). There is a "high bar" for finding such red-flag knowledge. *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009). The infringing nature of the material must be "apparent from even a brief and casual viewing." H.R. Rep 105-551 (II), at 58 (1998). The "common-sense result of this 'red flag' test" is that service providers are not "required to make discriminating judgments about potential copyright infringement." *Id*. To the contrary, "if investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'" *Veoh,* 665 F. Supp. 2d at 1108 (citation omitted).

Giving red-flag knowledge a limited role is fundamental to the DMCA. Rather than require service providers to make "difficult judgments as to whether conduct is or is not infringing" (S. Rep. 105-190, at 52), the DMCA created a balanced notice-and-takedown regime that

12

serves as the primary mechanism for online copyright enforcement. Under this regime, copyright owners must provide service providers with information about what particular material on their systems is infringing. 17 U.S.C. § 512(c)(2)(3). In response, the provider must "expeditiously" remove the identified material (§ 512(c)(1)(C)) while giving the alleged infringer a chance to submit a "counter notification" explaining that the material does not infringe (§ 512(g)).

This notice-and-takedown system provides a streamlined process for removing suspected infringing material from online services. It gives clarity to both service providers and copyright owners, setting the stage for voluntary cooperation. It reflects the significant advantages that copyright owners have in identifying infringement of their works (*see infra* Section I.B.2). And it recognizes that not all suspected infringements are actually infringing. Unilateral removals by service providers have none of those virtues. It is not surprising therefore that Congress confined the DMCA's knowledge provisions to cases where the infringing nature of the material is truly obvious.

Mavrix's decision to forego the DMCA's notice process "stripped it of the most powerful evidence of a service provider's knowledge—actual

notice of infringement from the copyright holder." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004). Having done so, Mavrix cannot now distort the statute to deprive LiveJournal and other services of the protection that Congress intended.

> 2.    Determining Infringement Requires Consideration of Complex Factual And Legal Questions

Mavrix's effort to dilute the knowledge required for safe-harbor disqualification also ignores a practical reality: it is very difficult for online services to determine, in the mass of material submitted by their users, what items are actually infringing. This makes it critical to give the DMCA's knowledge provisions the limited scope Congress intended.

Whether something is infringing is a legal conclusion informed by an array of legal and factual questions:

- Is the material protected by copyright or might it be in the public domain? *See, e.g., Golan v. Holder*, 132 S. Ct. 873 (2012).

- If it's protected by copyright, who is the "author" of the work? *See, e.g.*, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) (discussing authorship requirement); *Garcia v. Google, Inc.*, __ F.3d ___, No. 12-57302, 2015 U.S. App. LEXIS 8105 (9th Cir. May 18, 2015) (en banc) (addressing whether an individual actor's performance in a movie is copyrightable and, if so, who owns the relevant copyrights).

- Who holds the copyright(s) in the work? Is the work co-owned by multiple copyright holders? Has any author assigned or transferred ownership of the copyright to someone else? *See, e.g.*,

14

*Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 475 (S.D.N.Y. 2002) (defendant's "lack of knowledge regarding true copyright ownership objectively reasonable" where ownership turned on "complex analysis of contractual arrangements going back twenty years"), *opinion modified*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002).

•   Who uploaded the content to the service? Was the item uploaded by the copyright owner or its agent? *See, e.g.*, *Veoh*, 665 F. Supp. 2d at 1110 n.13 (evidence that a popular band uploaded one of the band's videos to online service sued for infringement).

•   If not, did the uploader have permission from any of the copyright owners to upload the work? Was there an express license? An implied license? Did the copyright owner encourage or approve the uploading of the work? *See, e.g.*, *Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) ("nonexclusive license[s] may be granted orally, or may even be implied from conduct.") (quoting 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 10.03[A], at 10-36 (1989)).

•   Even if the initial uploading was unauthorized, did the copyright owners know that the work had been posted and decide to acquiesce in its presence there? *See, e.g.*, *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (knowledge coupled with acquiescence can amount to implied license).

•   Even if the posting was unauthorized, is it a fair use? *See* 17 U.S.C. § 107.

These questions, and others, must be asked and answered each time an infringement determination is to be made. Copyright infringement, in other words, isn't like obscenity: you don't just know it when you see it.

This bears directly on the DMCA's knowledge inquiry. An item is not infringing if it is in the public domain, or if it was posted by the cop-

15

yright owner, or has otherwise been authorized by the copyright owner, or if it is a fair use. A service provider cannot have actual knowledge of infringement unless it knows that none of those things is true. Likewise, because red-flag awareness requires facts that make "the specific infringement 'objectively' obvious to a reasonable person" (*Viacom*, 676 F.3d at 31), such awareness does not exist unless the answer to each of those questions is *obvious*. Thus, in a passage of the legislative history directly applicable to this case, Congress explained that a service provider should not be charged with knowledge "merely because it saw one or more well known photographs of a celebrity." S. Rep. 105-190, at 48.

In adopting this standard, Congress understood that online services generally lack the information needed to ascertain infringement. S. Rep. 105-190, at 48 (a service provider "could not be expected" in a brief encounter with material online to determine whether it "was still protected by copyright," "whether the use was licensed," and "whether it was permitted under the fair use doctrine"). That is particularly true of smaller service providers, many of which do not have the teams of lawyers—or the budget—that would be needed for that task.

By contrast, "[c]opyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers … who cannot readily ascertain what material is copyrighted and what is not." *Shelter Capital*, 718 F.3d at 1022. It thus makes sense that the DMCA was designed to "place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Id.* at 1023 (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007)).

3.  Determining Ownership, Authorization, And Fair Use
    Is Especially Challenging For Online Services

The operational environment faced by online services makes it even more challenging for them to make these determinations of ownership, authorization, and fair use.

**Ownership**. Services like those of *amici* are home to a massive array of content from around the world. New postings pour in every minute in every language imaginable, referencing cultural trends, personalities, news events, and political issues big and small. This material comes in many different forms: text, images, videos, music, and audio files. Service providers often have little idea who owns the relevant cop-

yrights or even whether the material originates with a professional content creator. These days, much of what looks or sounds professional is made by amateurs, and vice versa. *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1149 (N.D. Cal. 2008) ("with the video equipment available to the general public today, there may be little, if any, distinction between 'professional' and amateur productions.").

***Authorization***. Similar problems beset online services in trying to determine whether particular material is authorized. Even if the user who posted an item did not create it, that user may have obtained permission from a copyright holder to use the content. Moreover, the copyright in many works is shared by separate co-owners, each of whom has the independent right to license use of the work. *See Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1126-1127 (C.D. Cal. 2001). And where such an understanding exists between the user and a copyright owner, the service provider is exceedingly unlikely to know or be able to find out about it. But such arrangements belie any assumption that material not posted by the actual creator is necessarily unauthorized.

Compounding these difficulties are the actual practices of many copyright owners, who often welcome—or at least actively tolerate—the

18

presence of their material on user-submitted content platforms. Artists and media companies often post their content to online service, in many cases without indication of where it's coming from. *See, e.g.*, *Veoh*, 665 F. Supp. 2d at 1110 & n.13 (describing evidence of guerilla marketing); Ethan Smith & Peter Lattman, *Download This: YouTube Phenom Has a Big Secret*, Wall St. J., Sept. 6, 2007, at A1, *available at* http://online.wsj.com/news/articles/SB118903788315518780 (describing singer signed by major label who simultaneously was masquerading as an amateur on YouTube and MySpace). There are countless instances of movie studios, television networks, and record labels authorizing their works to appear on online services for promotional purposes outside the context of traditional licensing arrangements. *See, e.g.*, Robert Sprague & Mary Ellen Wells, *Regulating Online Buzz Marketing: Untangling a Web of Deceit*, 47 AM. BUS. L.J. 415, 421-22 (2010); Andrew M. Kaikati & Jack G. Kaikati, *Stealth Marketing: How to Reach Consumers Surreptitiously*, 46 CAL. MGMT. REV. 6, 8-9 (2004).

Copyright owners large and small recognize the value of user-generated content services in helping generate "buzz" for their works and engage with their fans. In many cases, it is unclear who actually

owns the rights to that content. Indeed, media companies and other copyright owners sometimes deliberately obscure their involvement or choose not to request removal of certain user-posted items that include their copyrighted works, because those items often provide valuable promotional and brand-awareness benefits for the companies. *CCBill*, 488 F.3d at 1114 ("describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen.").

These practices confirm the need for a strict knowledge standard. By quietly authorizing and deliberately allowing their content to appear on various online services, copyright owners have precluded any simple inference that the presence of recognizable material amounts to infringement. *Cf. Capitol Records, Inc. v. MP3tunes, LLC,* 821 F. Supp. 2d 627, 644 (S.D.N.Y. 2011) ("EMI itself regularly distributes works on the internet for free. Because of these activities, EMI's executives concede that internet users, including MP3tunes' users and executives, have no way of knowing for sure whether free songs on the internet are unauthorized."). And there is no reason to make service providers guess. In the face of reasonable uncertainty about whether something is author-

ized or approved, the DMCA permits online services to await instructions from the copyright owner in the form of a takedown notice.

*Fair Use*. Finally, even if a service provider has reason to know that a given item is unauthorized, fair use must still be considered before being required to remove that item under the DMCA. *Cf. Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008) (copyright owners must make a good-faith consideration of fair use before sending takedown notices). A fair use determination is notoriously "flexible … it is not to be simplified with bright-line rules," but "calls for a case-by-case analysis." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007); *accord Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-94 (1994) (assessing whether song parody was fair use).

The fair use issues confronting online services like *amici* are particularly vexing (and important) given the myriad ways that Internet users rely on existing works to create new expression. User-submitted material frequently uses images, songs, movies, and similar material from third parties as springboards for creative expression. Images or excerpts from such works are incorporated in the spirit of analysis, commentary, or parody. Users add music clips to their home videos, add

their own words to existing works, and reconfigure the news into comedy. Music and video are remixed, mashed-up, or otherwise transformed into fan-fictions, image art, tributes, and commentaries. *See, e.g.*, *Lenz*, 572 F. Supp. 2d at 1151-52 (case involving home video of kids dancing to Prince song); http://textsfromhillaryclinton.tumblr.com (blog combining photograph of Hillary Clinton with photographs of other politicians and celebrities and satirical captions); Lawrence Lessig, *Free(ing) Culture for Remix*, 2004 UTAH L. REV. 961 (2004).

Copyright owners often approve of (or tolerate) such uses, believing that they stimulate demand for their works and not wanting to antagonize fans. *See, e.g.*, Casey Fiesler, *Everything I Need To Know I Learned from Fandom: How Existing Social Norms Can Help Shape the Next Generation of User-Generated Content*, 10 VAND. J. ENT. & TECH. L. 729, 758 (2008) ("Just as many authors turn a blind eye to, or even encourage, fan fiction, some media corporations have publicly stated that they have no problem with fanvids and mash-ups.").

22

## II. MAVRIX'S APPROACH WOULD DISCOURAGE SERVICE PROVIDERS FROM MONITORING OR INTERACTING WITH USER-SUBMITTED CONTENT

These realities provide additional reasons not to use LiveJournal's content-moderation efforts as a basis for evicting it from the safe harbor. Online services interact with user-submitted material in a variety of ways. These interactions protect services or their users from offensive, irrelevant, and other objectionable material. They also allow service providers to help users locate the information most relevant and interesting to them. Recognizing the challenges of discerning which items they encounter might be infringing, and intended to protect free expression online, the DMCA gives providers room to engage in these salutatory forms of content review. Mavrix's approach would undo that.

### A. The DMCA Gives Providers Room To Monitor Their Services For Objectionable or Irrelevant Material

Most online services make some effort to review the items posted on their services to ensure that they are not illegal, offensive, or otherwise objectionable. As Tumblr's Community Guidelines explain, online services "draw lines around a few narrowly defined but deeply important categories of content and behavior that jeopardize our users, threaten our infrastructure, and damage our community."

23

http://www.tumblr.com/policy/en/community. Examples of such material include obscenity, child pornography, hate speech, sexual harassment, bullying, graphic violence, threats, and spam—which is nearly always prohibited by the provider's terms of use. Other services are committed to a particular type of content—in Etsy's case, handmade or other unique goods—and they may review user-submitted content to ensure that what has been posted fits within the service's mission.

Making efforts to remove such material benefits online services, their users, and the public. While most users of services like *amici* contribute legitimate content, there is always a minority that abuses the freedom that online platforms offer. Videos depicting child abuse, sexual torture, or graphic violence; postings that harass or bully others; messages aimed at defrauding members of the public, and gratuitous spam—such content deeply offends users and can put them at risk of harm. It also distracts from the legitimate material that responsible users post and undermines the community that online services are trying to build. Consistent with their commitment to protecting freedom of speech, service providers have considerable cause to monitor user-

submitted content in ways that have nothing to do with looking for possible copyright infringement.

Service providers police their rules in different ways, but enforcement often requires service providers to interact with content submitted at the direction of a user. Without at least looking at an item, providers generally can't determine whether the content violates its policies. As explained above, Congress approved of such review and wanted the DMCA to eliminate disincentives for service providers to engage in it. By allowing (but not requiring) service providers to monitor or moderate and by insisting that infringement be truly obvious, the statute lets online services continue their valuable content-review efforts without forfeiting the safe harbor merely because they do not remove material that may turn out to have been infringing. Otherwise, service providers would be faced with a stark choice between preserving their DMCA protection and working to stamp out harmful, irrelevant, and even unlawful uses of their services. That is not what Congress intended.

## B. The DMCA Allows Service Providers To Help Users Find The Most Desirable Content

Service providers also have more positive reasons for interacting with user-submitted content. Online services like *amici* facilitate access

by users to a massive amount of content, with new material pouring in constantly. Without some order and organization, users may not be able to find what they're looking for, and the best and most interesting postings may get lost. To prevent that, service providers take steps to help users identify and more readily access the content that is particularly relevant and interesting to their users.

These measures often demand engagement with users' material. Service providers may often be in direct contact with such material as they try to determine the appropriate "tag" to place so that subsequent users' searches return responsive material. Community managers may work to organize content around particular topics so that users can find and bond with like-minded individuals. Or providers may sift through postings in an effort to decide which ones should be placed on what portions of the service, which might be of special value, or which may create unique excitement. For example, each day Tumblr's "Radar" feature spotlights a handful of posts from the service's millions of active bloggers that most captivate Tumblr's staff. Etsy does something similar, highlighting trending items and "top finds" from its most discerning us-

ers. These efforts benefit talented creators whose works otherwise might not get the recognition they deserve.

The public benefit of such interactions can be illustrated by the role that online services played in the Arab Spring of 2011. By highlighting and tagging relevant posts, these services made it possible for users across the globe to track and join the conversation, for those on the ground to share their experiences with an engaged audience, and for media outlets and governments to observe conditions and trends in real-time. *See* Philip N. Howard, et al., *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?*, Project on Information Technology and Political Islam, Sept. 11, 2011, *available at* http://pitpi.org/?p=1051.

In enacting the DMCA, Congress recognized the importance of allowing online services to use human review to help make online content more accessible. The legislative history specifically contemplates that service providers would use "human editors and reviewers" to examine material slated for inclusion on their services. S. Rep. 105-190, at 48-49. This was part of what the safe harbors were intended to protect. After all, as Congress explained, the use of "human judgment and editorial

27

discretion" in organizing content plays a "valuable role in assisting Internet users to identify and locate the information they seek on the decentralized and dynamic networks of the Internet." *Id.*

The DMCA's strict knowledge standards were integral to this protection. By requiring awareness of "red flags" making specific instances of infringement "obvious" based on a "brief and casual viewing," the DMCA was designed to ensure that online services would be able to "view and classify" online content so that their users can "identify and locate the information they seek." *Id.* In no uncertain terms, Congress instructed that the "knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention." *Id.* at 49.

Yet Mavrix seeks precisely that. If approved, its arguments about content moderation would deter providers from using human agents to help arrange or catalogue the content on their systems. Not only would that frustrate a key purpose of the DMCA, it would materially diminish the quality of online services and undermine their social and political value. Users would have a harder time finding what is most interesting to them, and the best content might get lost in the crowd.

28

## C.   Proper Application Of The DMCA Protects Legitimate Online Expression

Mavrix's approach would also significantly erode free expression online. If they cannot review user-submitted material without fear that every missed infringement will cost them the safe harbor, and if they decide not to stop review user content for all the reasons discussed above, service providers may feel compelled to respond by removing anything they come across that raises even a question about infringement.

That result would be just as bad. Inevitably, much of the material that would be removed in such purges would not be infringing. User-submitted items that may have seemed questionable would turn out to be original, approved by the copyright owner, or fair use. *E.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 747 (S.D.N.Y. 2012) ("[A] policy under which Photobucket assumes infringement could result in Photobucket unlawfully blocking others from uploading images to which they hold valid licenses."). Eliminating such innocent content does a disservice to users and the public. It would take important voices out of the conversation, demoralize those trying to make themselves heard, and impede users' ability to participate in cultural and political

29

discussion. This would leave online services less free and open, diminishing their role as hotbeds of creativity, news, and public debate.

This would be especially problematic when it comes to fair use. "The fair use doctrine is an integral part of copyright law precisely because it gives authors breathing space within the confines of copyright to build upon their predecessors' works." *Sofa Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273, 1280 (9th Cir. Cal. 2013) (internal quotation marks omitted). As described above, services like *amici* host many user-submitted items that are legitimate candidates for fair-use protection—mash-ups and memes on Tumblr; creatively repurposed items offered for sale on Etsy; and thumbnail photographs linking to full-size images on other websites posted on Pinterest, to give just a few examples.

Removing such material would deprive users of the right to appropriate existing culture into new works. And it would diminish the public's ability to enjoy and be inspired by those creations. This result has serious consequences for creatively and self-expression on the Internet. The "unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved." *Lenz*, 572 F. Supp. 2d at 1156. This is entirely con-

trary to the DMCA's purpose to ensure "that the variety and quality of services on the Internet will continue to expand." S. Rep. 105-190, at 8.

## CONCLUSION

For nearly two decades, the DMCA has helped the Internet flourish by allowing online services to interact with user-submitted content in various beneficial ways. Proper application of the statute's knowledge and control standards is integral to the protections that the DMCA provides. The District Court correctly applied those standards. This Court should affirm its ruling.

Dated: June 22, 2015      Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

By: s/ *Brian M. Willen*
     Brian M. Willen
     1301 Avenue of the Americas
     40th Floor
     New York, New York 10019
     (212) 999-5800

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains  6,130  words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: June 22, 2015                          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

By: s/ *Brian M. Willen*
     Brian M. Willen
     1301 Avenue of the Americas
     40th Floor
     New York, New York 10019
     (212) 999-5800

*Counsel for Amici Curiae*

32

9th Circuit Case Number(s)

14-56596

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

June 22, 2015

.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)

/s Brian M. Willen

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)