

4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, CA 92660

Peter Afrasiabi
949.502.2871 Direct
pafrasiabi@onellp.com

949.502.2870 Tel
949.258.5081 Fax
www.OneLLP.com

September 15, 2016

*VIA CM/ECF*

Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

    Re:   *Mavrix Photographs, LLC v. LiveJournal, Inc.*
           Case No. 14-56596

Dear Ms. Dwyer:

    Pursuant to FRAP 28(j), Appellant Mavrix Photographs LLC hereby submits this response to Appellee Live Journal, Inc.'s supplemental letters filed with this Court on May 6, 2016 and June 23, 2016. Appellee's supplemental letters pertain to two decisions: *BWP Media USA, Inc. v. Clarity Digital Grp.*, 820 F.3d 1175 (10th Cir. 2016) and *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016). Neither *BWP* nor *Capitol Records* impacts the merits of Mavrix's position in this appeal.

*BWP Media USA, Inc. v. Clarity Digital Grp.*

    To put it bluntly, *BWP* is incorrectly decided. By defining "user" in § 512(c) of the Digital Millennium Copyright Act as any one "who avails [himself] of the service provider's system to store material," *BWP*, 820 F.3d at 1179, including agents or employees of the ISPs, *BWP* advances a definition of "user" that effectively nullifies the distinction between third parties and ISP's that lies at the heart of the DMCA's limited exemption from infringement liability. Such an expansive reading of "user" also frustrates the legislative intent behind § 512(c). Not surprisingly, therefore, *BWP*'s interpretation of "user" directly flies in the face of the judgment of other courts that have considered the issue.

    If an ISP's agents—whether employees or independent contractors over whom they exercise control—could simply upload materials to the ISPs website and be considered users, ISPs could avoid all infringement liability by effectively sourcing infringing activities to their agents. Such a state of affairs frustrates the entire purpose of the DMCA, which created a limited exclusion from infringement liability for passive ISPs who, through no fault of their own, had infringing activities occurring on their sites. As the House and Senate Reports on § 512(c)

Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
September 15, 2016
Page 2



make clear, "[i]nformation that resides on the system or network operated by or for the service provider through *its own acts or decisions* and not at the direction of a user *does not fall* within the liability limitation of subsection [§ 512](c)." H.R. Rep. No. 105-551(II), at 53; S. Rep. No. 105-190, at 43 (same) (emphasis added). The DMCA was meant to protect ISPs from infringement liability for conduct not fairly attributable to them, not to give ISPs a *carte blanche* to engage in infringement through their employees or other agents.

As a result, other courts considering the issue have rejected *BWP*'s expansive reading of "user." In the Second Circuit for example, courts have systematically defined user as a third-party over whom the ISP does not exercise control. See, e.g., *Capitol Records, LLC v. Vimeo, LLC*, 972 F.Supp.2d 500, 517-18 (S.D.N.Y. 2013) (finding employee was not user within meaning of DMCA).

Finally, even if one adopts *BWP*'s erroneous definition of user, that does not impact the ultimate outcome in this appeal. As *BWP* made clear, while ISP agents might constitute "users," the relevant query for purposes of liability immunity under § 512(c) is "who directed the storage of the infringing content." *BWP*, 820 F.3d at 1181. Thus, in *BWP,* "No reasonable trier of fact could find that the infringement was at the direction of [the defendant]" because the defendant there "ma[de] clear copyright infringement was prohibited [and] also provided [its agents] with licensed photographs to accompany their articles." *Id*. That is certainly not the case here, as LiveJournal actively solicited submission of high-quality, timely celebrity content from known, reputable (i.e., professional) sources copied in their entirety. 7ER1116, 1202:10-1203:16, 1206:7-24, where submissions are not just given cursory or automated review but, rather, manually considered and content is carefully curated. 7ER1120-22, 7ER1215:5-20, 7ER1276, 16ER3418, 16ER3424. Further, whereas the defendant in *BWP* provided its agents with licensed content to adorn their self-drafted submissions, LiveJournal has no licensed content because their "rules" are the antithesis of a licensing scheme and the uploaders are never asked to draft their own content because LiveJournal's agents are expressly asked to copy content wholesale from third-party sources. Finally, even if *BWP* lacked a factual record to justify a non-agency finding as a matter of law, this record is the opposite.

<u>Capitol Records, LLC v. Vimeo, LLC</u>

In *Capitol Records*, the Second Circuit vacated (not reversed, as LiveJournal erroneously claims) a denial of summary judgment for Vimeo on the issue of red-flag knowledge under the DMCA's safe harbor. As the court concluded, "the mere fact that an employee of the service provider has viewed a video posted by a user (absent specific information regarding how much of the video the employee saw or the reason for which it was viewed) . . . would be insufficient . . . to make infringement *obvious* to an ordinary reasonable person." *Id.* at 94 (emphasis in original).

But, as the court clarified and LiveJournal fails to point out, denial of the safe harbor on red-flag knowledge grounds would, in fact, be warranted if plaintiffs can provide evidence that the defendant's personnel knew facts that would make the infringing activity "obvious to any

Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
September 15, 2016
Page 3



ordinary person who had no specialized knowledge of music or the laws of copyright." *Id.* at 97. And, unlike Vimeo's moderators, LiveJournal's moderators had knowledge of facts that made infringing activity obvious. While *Capitol Records* involved just a single Vimeo employee having actually viewed a single video that contain some "recognizable" music, slip op. 40, 44, the undisputed facts here show that LiveJournal's Brenden Delzer looked at and reviewed **all posts** on the ONTD website. 7ER1147:24-1148:3, 7ER1121, 7ER1212-15. And, contrary to LiveJournal's misleading assertion that these posts contained "low-quality photographs of celebrities that are not at all recognizable as copyrighted work" (a claim for which there is no record evidence), these posts contained photographs that were manifestly professional and copyrighted as, inter alia, they had proprietary watermarks affixed to them,15ER3107-16, or had a direct credit to Mavrix listed with them, 5ER894-95—a far cry from the situation from *Capitol Records*, where there were no clear indicia of copyright owner and protection in the single work that was partially viewed by an employee. Nor was Vimeo not a music-centric niche website built around rules asking users to upload music from known reputable music content sources.

      To wit, LiveJournal refuses to license any content (7ER1247:12-1249:9, 6ER947¶9) and publishes reputable content from known sources (7ER1116, 1202:10-1203:16), so it effectively knows all content is taken illegally. In fact, it even complains to its moderators if the reproduced content is not from a referenced source, 16ER3424-25, 17ER3465, 16ER3460. And, when confronted with the question of whether it should change its "rules" to reduce how much content is copied on its website, LiveJournal decided not to do so because it would be sub-optimal to limit the content appearing on the site. 16ER9075-76. For this reason, when individuals actually protested to LiveJournal about their (stolen) submissions being removed after a copyright owner complained, LiveJournal literally laughed off those protests and proceeded to inform the individual that, of course, their actions were illegal. 16ER3435. If LiveJournal knows that its users have engaged in illegal activity when they take third-party content whole and submit it to the ONTD website for republication, it cannot turn around and tell this Court with a straight face that it had no idea, and lacked red-flag knowledge, of infringing activity on its website when it directly reproduces "sourced" third-party content. As such, *Capitol Records* actually supports Mavrix's position that LiveJournal possessed red-flag knowledge of infringement on its network and, as a result, should have been denied summary judgment on the issue of the DMCA safe harbor. At a minimum, the issue of red-flag knowledge belonged to a jury.

      Sincerely,

      /s/ Peter R. Afrasiabi

      Peter Afrasiabi,
      For Appellant Mavrix Photographs, LLC

cc: All counsel of record (via ECF)

## **CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 15, 2016.

      I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

                                                             /s/ Peter R. Afrasiabi
                                                            Peter R. Afrasiabi